1  Linda M. Dardarian (SBN 131001)
   ldardarian@gbdhlegal.com
2  Andrew P. Lee (SBN 245903)
   alee@gbdhlegal.com
3  GOLDSTEIN, BORGEN, DARDARIAN & HO
   300 Lakeside Drive, Suite 1000
4  Oakland, CA 94612
   Tel:  (510) 763-9800
5  Fax:  (510) 835-1417

6  Timothy P. Fox (SBN 157750)
   tfox@creeclaw.org
7  CIVIL RIGHTS EDUCATION AND
     ENFORCEMENT CENTER
8  1245 E. Colfax Avenue, Suite 400
   Denver, CO 80218
9  Tel:  (303) 757-7901

10 *Attorneys for Plaintiff and the Settlement Class*

11            **UNITED STATES DISTRICT COURT**

12           **NORTHERN DISTRICT OF CALIFORNIA**

13                  **SAN JOSE DIVISION**

14 ARTIE LASHBROOK, on behalf of himself and all
   others similarly situated,
15
             Plaintiff,
16
17 vs.

18 CITY OF SAN JOSE,

19           Defendant.

20

21

| | |
|---|---|
| **CLASS ACTION** | |
| Case No.: 5:20-CV-01236-NC | |
| **[PROPOSED] FINAL JUDGMENT AND ORDER APPROVING CLASS ACTION SETTLEMENT** | |
| Date:     September 2, 2020 | |
| Time:     1:00 p.m. | |
| Dept:     Courtroom 5 | |
| Before:  Hon. Nathanael Cousins | |

788982.4

WHEREAS, on September 2, 2020, at 1:00 p.m., the Court held a hearing (the "Fairness Hearing") to determine, among other things, whether the settlement in this action by Defendant City of San Jose ("the City") and Plaintiff Artie Lashbrook ("Plaintiff"), as set forth in the Consent Decree, a copy of which is attached hereto as Exhibit 1 (the "Consent Decree"), is fair, reasonable and adequate, such that an Order of final approval should be issued and a final judgment upon said Consent Decree should be entered by the Court,

WHEREAS, the Fairness Hearing was attended by the Parties, through their respective counsel of record in this action, and by such other individuals and entities as set forth in the record in this matter, and

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED AS FOLLOWS:

1.      The Court, for the purposes of this Judgment, adopts the terms and definitions set forth in the Consent Decree.

2.      The Court has jurisdiction over the subject matter of this action, the Plaintiff, the Settlement Class, the Consent Decree, and the City.

3.      The Court finds that the Notice of Proposed Settlement of Class Action Lawsuit ("Settlement Notice") notified the Settlement Class of the pendency of this action and of the proposed settlement and was disseminated by each of the means required under the Consent Decree and the Order Granting Preliminary Approval of Class Action Settlement (ECF No. 14) dated May 27, 2020, and was otherwise fully implemented.

4.      The Court finds that the Settlement Notice, as ordered and implemented, was reasonably calculated under the circumstances to apprise the Settlement Class Members of the pendency of this action, all material elements of the proposed Settlement, and their opportunity (a) to submit written objections to the Settlement, and (b) to appear at the Fairness Hearing to object to or comment on the Settlement.  The Settlement Notice was reasonable and the best notice practicable to all Settlement Class Members and complied with the Federal Rules of Civil Procedure, due process, and all other applicable laws and rules.  A full and fair opportunity has been afforded to the members of the Settlement Class to participate during the Fairness Hearing, and all other persons wishing to be

1

788982.4

heard have been heard.  Accordingly, the Court determines that all members of the Settlement Class, as set forth below, are bound by this Judgment.

5.     On May 27, 2020, this Court appointed Plaintiff as class representative of the Settlement Class, and appointed the following counsel as Class Counsel to represent the Settlement Class: (i) Goldstein Borgen Dardarian & Ho; and (ii) Civil Rights Education and Enforcement Center.

6.     On May 27, 2020, this Court provisionally certified the following Settlement Class pursuant to Federal Rule of Civil Procedure 23(a) and (b)(2), based on the findings in the Order of the same date:  "All persons (including residents of and/or visitors to the City of San Jose) with any Mobility Disability, who at any time prior to the Court granting final approval of the Consent Decree, have been denied full and equal access to the City's pedestrian right of way due to the lack of a curb ramp or a curb ramp that was damaged, in need of repair, or otherwise in a condition not suitable or sufficient for use."  This Court finds that the Settlement Class continues to meet the requirements for class certification under the Federal Rules of Civil Procedure and all other applicable laws and rules.

7.     In particular, the Court finds that: (a) joinder of all Settlement Class Members in a single proceeding would be impracticable, if not impossible, because of their numbers and dispersion; (b) there are questions of law and fact common to the Settlement Class; (c) Plaintiff's claims are typical of the claims of the Settlement Class that he seeks to represent for purposes of settlement; (d) Plaintiff has fairly and adequately represented the interests of the Settlement Class and will continue to do so; (e) Plaintiff and the Settlement Class are represented by qualified, reputable counsel who are experienced in preparing and prosecuting class actions, including those involving the sort of practices alleged in the Complaint; and (f) the City acted or refused to act on grounds that apply to the Settlement Class, so that final declaratory and injunctive relief is appropriate to the Settlement Class.

8.     Class certification is therefore an appropriate method for protecting the interests of the Settlement Class and resolving the common issues of fact and law arising out of the Plaintiff's claims while also eliminating the risk of duplicative litigation.  Accordingly, the Court hereby makes final its earlier provisional certification of the Settlement Class and further confirms the appointment of the Class Representative and Class Counsel to represent the Settlement Class, as set forth above.

788982.4

9.      The Court grants final approval of the Settlement set forth in the Consent Decree and finds, after considering all of the factors set forth in Federal Rule of Civil Procedure 23(e)(2), that it is fair, reasonable, adequate, and in the best interests of the Settlement Class as a whole.  The Settlement, which was negotiated at arm's length, offers Settlement Class members comprehensive injunctive relief regarding all of the claims in Plaintiff's Complaint, and treats Settlement Class members equitably relative to each other.  The Court grants final approval of the release of the City from the Released Claims as set forth in the Consent Decree.

10.     The Court further finds that the City's Annual Commitment, which requires the installation or remediation of 27,621 Non-Compliant Curb Ramps by the end of 2038, as set forth in the Consent Decree is proper and reasonably calculated based on the available information to ensure and maintain accessibility of the pedestrian right of way located in the City of San Jose to persons with Mobility Disabilities.  Accordingly, the Settlement shall be consummated in accordance with the terms and conditions of the Consent Decree.

11.     No Class Member has objected to the Settlement.  The absence of any objections further supports the Settlement's final approval.

12.     The Class Representative and all Settlement Class Members (and their respective heirs, assigns, successors, executors, administrators, agents and representatives) are conclusively deemed to have released and forever discharged the City from all Released Claims as set forth in the Consent Decree.  The Class Representative and all Settlement Class Members are bound by this Judgment.

13.     The benefits described in the Consent Decree are the only consideration, fees, costs and expenses that the City shall be obligated to give to any party or entity, including without limitation the Class Representative, Settlement Class Members, and Class Counsel in connection with the claims released in the Consent Decree and/or the payment of attorneys' fees, costs, and expenses in this action.

14.     The Consent Decree and this Judgment are not admissions of liability or fault by the City, or a finding of the validity of any claims in this action or of any wrongdoing or violation of law by the City.  The Consent Decree is not a concession by the Parties and, to the fullest extent permitted by law, neither this Judgment, nor any of its terms or provisions, nor any of the negotiations connected

with it, shall be offered as evidence or received in evidence in any pending or future civil, criminal, or administrative action or proceeding to establish any liability of, or admission by the City.

15. Notwithstanding the foregoing, nothing in this Judgment shall be interpreted to prohibit the use of this Judgment to consummate or enforce the Consent Decree or Judgment, or to defend against the assertion of Released Claims in any other proceeding, or as otherwise required by law.

16. In accordance with the terms of the Consent Decree, which is attached hereto, the Court reserves exclusive and continuing jurisdiction over Plaintiff, the Settlement Class Members, the City, and the Consent Decree throughout the term of the Consent Decree, for the sole purpose of supervising the implementation, enforcement, construction, and interpretation of the Consent Decree and this Judgment. In that regard, any challenges to the Consent Decree's terms or implementation, whether under state or federal law, shall be subject to the exclusive and continuing jurisdiction of this Court.

**IT IS SO ORDERED.**

Dated: _____       _____

Nathanael M. Cousins
United States Magistrate Judge

788982.4

# EXHIBIT 1

1  Linda M. Dardarian (SBN 131001)
   ldardarian@gbdhlegal.com
2  Andrew P. Lee (SBN 245903)
   alee@gbdhlegal.com
3  GOLDSTEIN, BORGEN, DARDARIAN & HO
   300 Lakeside Drive, Suite 1000
4  Oakland, CA 94612
   Tel:  (510) 763-9800
5  Fax:  (510) 835-1417

6  Timothy P. Fox (SBN 157750)
   tfox@creeclaw.org
7  CIVIL RIGHTS EDUCATION AND ENFORCEMENT
   CENTER
8  1245 E. Colfax Avenue, Suite 400
   Denver, CO 80218
9  Tel:  (303) 757-7901

10 *Attorneys for Plaintiff*

11              **UNITED STATES DISTRICT COURT**

12            **NORTHERN DISTRICT OF CALIFORNIA**

13                   **SAN JOSE DIVISION**

14 ARTIE LASHBROOK, on behalf of himself and all | Case No.: 5:20-cv-01236-NC
   others similarly situated,
15                                               | **CONSENT DECREE**
            Plaintiff,
16                                               | **CLASS ACTION**
17 vs.
18 CITY OF SAN JOSE,
19          Defendant.

728351.35

This Class Action Consent Decree ("Consent Decree") is made and entered into by and between: (i) the City of San Jose (the "City"), and (ii) Plaintiff Artie Lashbrook ("Plaintiff"), on behalf of himself and the proposed Settlement Class.  The City and Plaintiff shall be referred to in this Consent Decree individually as a "Party" and collectively as the "Parties."

## I.   RECITALS

WHEREAS, Plaintiff Lashbrook is a resident of the City of San Jose and a person with a Mobility Disability who uses a wheelchair for mobility.  He is an individual with a disability within the meaning of Section 3(2) of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101, 12102(2) ("ADA"), Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §§ 705(20), 794(a) ("Section 504"), and California Government Code § 11135 and Cal. Code Regs. tit. 2, § 11187(a) ("Section 11135").

WHEREAS, on February 24, 2014, Plaintiff sent the City a letter asserting that Plaintiff and other City residents and visitors with mobility disabilities have been denied access to the City's pedestrian right of way because of a lack of accessible curb ramps throughout the City ("the Dispute").  Plaintiff offered to engage in Structured Negotiations, in lieu of litigation, to resolve the Dispute.  On March 28, 2014, the Parties executed a Tolling Agreement to protect the interests of all Parties during those negotiations and to avoid the burden, expense and potential risks of litigation.

WHEREAS, the Parties have engaged in good faith negotiations and shared relevant information regarding the Dispute.  The Parties have also conducted a thorough examination and investigation of the facts and law relating to the matters set forth in this Consent Decree, and have engaged in extensive and arms-length negotiations.

WHEREAS, on February 1, 2017, the Parties entered into an Interim Settlement Agreement that set forth certain preliminary obligations that the Parties fulfilled while they continued to negotiate toward a full resolution of the Dispute.  The Interim Settlement Agreement required the City to complete a survey of all curb ramps and corners of sidewalk segments at pedestrian crossings within the City's pedestrian right of way for compliance with applicable federal and state accessibility standards.  It also identified locations where curb ramps and traffic island cut-throughs are missing. The City completed its curb ramp survey in April 2018 and performed analytical and GIS-bound

reviews of the survey data, held multiple comment reconciliation meetings to ensure the quality of the survey data, and received the final survey results in the last quarter of 2018.

WHEREAS, the Interim Agreement also required the City to construct approximately 2,700 curb ramps over a two-year period and resolve curb ramps requests within one-hundred twenty (120) days of submission.

WHEREAS, the City does not admit, and specifically denies, that it has violated or failed to comply with or has any liability to Plaintiff under any provisions of the ADA, Section 504, Section 11135, or any applicable laws of the State of California relating to the accessibility of the pedestrian right of way for persons with mobility disabilities, any regulations or guidelines promulgated pursuant to those statutes, or any other applicable laws, regulations, or legal requirements.  Neither this Consent Decree, nor any of its terms or provisions, nor any of the negotiations connected with it, shall be construed as an admission or concession by the City of San Jose.  This Consent Decree and its terms and provisions shall not be offered or received as evidence for any purpose whatsoever against the City in any action or proceeding, other than a proceeding to enforce the terms of this Consent Decree.

WHEREAS, this Consent Decree and the releases contained herein cover only curb ramps on street segments with Pedestrian Walkways, and do not apply to components of the City's sidewalk system other than curb ramps.

WHEREAS, based upon extensive analysis of the facts and the applicable law and taking into account the risks and uncertainties associated with litigation and the delays that may result from trial and appeals, as well as the fair, cost-effective and assured method of resolving the potential claims of the Settlement Class represented by this Consent Decree, Class Counsel has concluded that this Consent Decree provides substantial benefit to the Settlement Class and is fair, reasonable, and adequate and in the best interest of the Plaintiff and the Settlement Class.

WHEREAS, the City has similarly concluded that this Consent Decree is desirable to avoid the time, risk, and expense of defending protracted litigation, to fulfill its long-standing commitment to promoting and enhancing the rights of those with disabilities, to ensure compliance with laws protecting the rights of individuals with Mobility Disabilities, and to resolve potential claims of the Plaintiff and the Settlement Class.

WHEREAS, this Consent Decree will be submitted to the United States District Court for the Northern District of California for preliminary and final approval under Rule 23 of the Federal Rules of Civil Procedure, as described below.

## II.   AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the sufficiency and receipt of which is hereby acknowledged, the Parties agree as follows:

**1.**   **Conditions Precedent**

The Consent Decree shall be effective (the "Effective Date") following federal court approval of this Consent Decree after notice to the Settlement Class, and shall become effective only when final judgment is entered by the District Court after the absence of any class member objections; or if there are objections by class members, when the time to appeal the final approval order expires without the filing of an appeal; or, if an appeal is filed, when the appeal is finally adjudicated or resolved in favor of affirming the approval of the Consent Decree.

**2.**   **Definitions**

For purposes of this Consent Decree, the following terms have the following definitions:

2.1   "2013 DOJ/DOT Alteration Guidance" means the 2013 Department of Justice/Department of Transportation Joint Technical Assistance on the Title II of the Americans with Disabilities Act Requirements to Provide Curb Ramps when Streets, Roads, or Highways are Altered through Resurfacing, attached hereto as Exhibit A.

2.2   "Access" or "Accessible," unless otherwise indicated, means conditions that comply with the standards set forth in the 2010 Americans with Disabilities Act Standards for Accessible Design, codified at 28 C.F.R. § 35.151 and 36 C.F.R. part 1191, and Appendices B and D (hereafter "2010 ADA Standards") or Title 24 of the 2019 California Building Code (hereafter "the CBC"). Access work performed pursuant to this Consent Decree shall be performed in compliance with the 2010 ADA Standards or the CBC, whichever provides greater protection or access to persons with mobility disabilities.  If during the term of this Consent Decree any new federal or California disability

728351.35

access design standards applicable to curb ramps in the pedestrian right of way become effective, those standards shall then become the standard for accessibility under this Consent Decree.

2.3    "Accessible Curb Ramp" means any curb ramp constructed or remediated by the City pursuant to this Consent Decree that complies with the 2010 ADA Standards and the CBC.

2.4    "Americans with Disabilities Act" or "ADA" means the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq.*

2.5    "Altered" or "Alteration," when used in reference to work performed as part of street, roadway, or highway resurfacing, means those alterations identified in the 2013 DOJ/DOT Alteration Guidance, and the Briefing Memo related thereto.  Specified alterations include but are not limited to the addition of a new layer of asphalt, asphalt and concrete, cape seals, concrete pavement rehabilitation and reconstruction, micro-surfacing and thin lift overlays, mill & fill, mill & overlay, open-graded surface course, and in-place asphalt recycling.

2.6    "Best Efforts" means the efforts a reasonable entity in the City's position would use to perform that obligation in good faith.

2.7    "Class Counsel" or "Plaintiff's Counsel" means collectively the Civil Rights Education and Enforcement Center (CREEC) and the law firm Goldstein, Borgen, Dardarian & Ho.

2.8    "Compliant Curb Ramp" means any curb ramp currently in compliance with the 2010 ADA Standards or, if built or altered prior to March 15, 2012, currently in compliance with the 1991 Americans with Disabilities Act Standards for Accessible Design ("ADAAG"), codified at 28 C.F.R., Part 36, including Appendix A, or the CBC, whichever provides greater protection or access to persons with mobility disabilities.

2.9    "Effective Date" means the date upon which the Consent Decree becomes a final judgment of the District Court presiding over this Action.

2.10    "Existing Pedestrian Facilities," for purposes of this Consent Decree, means any Pedestrian Facilities, or portions thereof, that were constructed prior to the Effective Date of this Consent Decree.

2.11    "High Priority Curb Ramps Barriers" means the curb ramp conditions set forth in Exhibit B, including the following: 1) missing curb ramps; 2) curb ramps with less than 32 inches clear

width; 3) curb ramps with running slopes exceeding 10%; 4) curb ramps with cross slopes exceeding 4%; 5) curb ramps with non-flush transitions; 6) curb ramps with counter slopes exceeding 10%; 7) curb ramps with side flare slopes exceeding 12.5% where top landings are provided; 8) curb ramps with side flare slopes exceeding 10% where top landings are not provided; 9) curb ramps with gaps or vertical edges greater than 1 inch; 10) parallel curb ramps with bottom landings that have slopes exceeding 4%; 11) parallel curb ramps with top landings that have slopes exceeding 4%; 12) parallel curb ramps with top landings that have running slopes exceeding 10%; 13) curb ramps with a combination of non-compliant running slopes, counter slopes, and non-flush transitions.

2.12    "Mobility Disability" or "Mobility Disabilities" means any impairment or medical condition that limits a person's ability to walk, ambulate, maneuver around objects, or to ascend or descend steps or slopes.  A person with a Mobility Disability may or may not use a wheelchair, scooter, electric personal assisted mobility device, crutches, walker, cane, brace, orthopedic device, or similar equipment or device to assist her or his navigation along sidewalks, or may be semi-ambulatory.

2.13    "New Construction and Alterations" means all work required to be performed, pursuant to 28 C.F.R. § 35.151, in connection with newly-constructed or Altered intersections, streets, roads, highways, and Pedestrian Walkways in the City during the Term of the Consent Decree.

2.14    "Pedestrian Facility" or "Pedestrian Facilities" means any street crossing, sidewalk, crosswalk, curb, curb ramp, walkway, pedestrian right of way, pedestrian undercrossing, pedestrian overcrossing, or other Pedestrian Walkway of any kind that is, in whole or in part, owned, controlled or maintained by or otherwise within the responsibility of the City of San Jose.

2.15    "Pedestrian Walkway" means a sidewalk or other prepared exterior surface provided for pedestrian travel in the public right of way that is, in whole or in part, owned, controlled or maintained by or otherwise within the responsibility of the City of San Jose.

2.16    "Program Access" means the obligation of the City of San Jose under Title II of the ADA and its implementing regulations, 28 C.F.R. § 35.150, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §§ 794, its implementing regulations, 45 C.F.R. § 84.22(a), 28 C.F.R. § 41.57, California Government Code § 11135, and its implementing regulations, Cal. Code Regs. tit. 2,

728351.35

§ 11195, to operate each service, program, or activity that takes place in Existing Pedestrian Facilities in such a manner that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities.

2.17    "Program Access Improvements" means all work performed by or on behalf of the City on Accessible Curb Ramps in order to bring any Existing Pedestrian Facilities in the City into compliance with the Program Access requirements of the ADA, Section 504, and Section 11135.

2.18    "Remediate" or "Remediation" means the correction of an existing non-Compliant curb ramp or associated curb ramp landings to create an Accessible Curb Ramp.

2.19    "Settlement Class" means the class of individuals ultimately defined and certified by a Court in this matter, in particular: "all persons (including residents of and/or visitors to the City of San Jose) with any Mobility Disability, who, at any time prior to court judgment granting final approval to this Consent Decree have been denied full and equal access to the City's pedestrian right of way due to the lack of a curb ramp or a curb ramp that was damaged, in need of repair, or otherwise in a condition not suitable or sufficient for use."

2.20    "Section 504" means Section 504 of the Rehabilitation Act of 1973, codified at 29 U.S.C. § 794 et seq.

2.21    "Section 11135" means California Government Code § 11135.

2.22    "Structural Impracticability" means the rare circumstances when an Accessible Curb Ramp cannot be constructed during construction of new Pedestrian Facilities because the unique characteristics of terrain prevent incorporation of Accessible Curb Ramps.

2.23    "Technical Infeasibility" or "Technically Infeasible" means the rare instances when an Accessible Curb Ramp cannot be constructed during alterations to Existing Pedestrian Facilities because of physical or site constraints.

2.24    "Transition Plan" means a transition plan that complies with 28 C.F.R. § 35.150(d), 45 C.F.R. § 84.22(e), 28 C.F.R. § 41.57(c), and Cal. Code Regs. tit. 2, § 11195.

2.25    "WCAG" means version 2.1 AA of the "Web Content Accessibility Guidelines" published by the Web Accessibility Initiative (WAI) of the World Wide Web Consortium (W3C).

**3.**     <u>**Term of Consent Decree**</u>

The Consent Decree shall become effective on the Effective Date and shall remain in effect until the earlier of: (1) the end of the 2038 fiscal year, or (2) the completion of the City's construction and remediation of Accessible Curb Ramps required under this Consent Decree.  If Plaintiff's Counsel dispute that the construction or remediation of Accessible Curb Ramps required under this Consent Decree has been completed, this Consent Decree shall remain in effect pending the conclusion of any dispute resolution proceedings or action to enforce the Consent Decree.  The foregoing time period is referenced herein as the "Term of the Consent Decree."

**4.**     <u>**Curb Ramp Construction Deadlines**</u>

The Parties agree to the following curb ramp construction deadlines:

4.1     Based on the City's curb ramp survey, there are 6,772 locations within the City where Accessible Curb Ramps are required but are missing.  The City shall construct Accessible Curb Ramps at those 6,772 locations by the end of 2030.

4.2     Based on the City's curb ramp survey, there are 14,611 curb ramps within the City that contain High Priority Curb Ramps Barriers.  This number excludes missing curb ramps, which are also defined as "High Priority Curb Ramps Barriers."  The City shall reconstruct or remediate those 14,611 curb ramps by the end of 2030.

4.3     Based on the City's curb ramp survey, there are 6,238 curb ramps within the City that do not comply with applicable federal and state accessibility standards, but are not defined as "High Priority Curb Ramps Barriers."  The City shall reconstruct or remediate those 6,238 non-compliant curb ramps by the end of 2038.

4.4     During each year of the Term of the Consent Decree, the City will construct, reconstruct or remediate a sufficient number of curb ramps to ensure that the City meets the deadlines set forth in Sections 4.1 to 4.3.

**5.**     <u>**Annual Monetary Commitment**</u>

5.1     Beginning on the Effective Date, the City shall appropriate thirteen million dollars ($13,000,000) each fiscal year ("Annual Monetary Commitment") toward the construction and remediation of curb ramps within the City until 2030.  After 2030, the City shall appropriate a

7

minimum of ten (10) percent of the City's pavement budget toward the construction and remediation of Curb Ramps until the City fulfills its obligations under this Consent Decree.  The Annual Monetary Commitment is the minimum amount the City is obligated to appropriate on an annual basis for the construction of curb ramps, including curb ramps constructed in connection with new construction and alterations of streets, roadways, and highways, remediation of existing curb ramps, and curb ramp requests, in order to meet the Curb Ramp Construction schedule set forth in Section 4.  If the Effective Date occurs mid-year, the Annual Monetary Commitment for the first year of the Term of Consent Decree may be prorated based on the number of days remaining in that year.

5.2     If in any fiscal year, the City is unable to appropriate the Annual Monetary Commitment due to a recession the City shall provide notice to Class Counsel.  The City shall remain compliant with this Consent Decree despite an appropriation below the Annual Monetary commitment if the City either: (a) remains on track to meet the Curb Ramp Construction Schedule set forth in Section 4 in the fiscal year even with the appropriation below the Annual Monetary Commitment, by maintaining an average rate of curb ramp construction and remediation of at least (1) 1,944 high priority curb ramps per year between the Effective Date and 2030, if the fiscal year at issue occurs during that period, or (2) 807 low priority curb ramps per year between 2031 and 2038, if the fiscal year at issue occurs during that period; (b) demonstrates that the sum of the appropriations for the two fiscal years prior to the appropriation below the Annual Monetary Commitment plus the fiscal year with the appropriation below the Annual Monetary Commitment is equal to three times the Annual Monetary Commitment; or (c) agrees to an additional appropriation over the next two fiscal years that is equivalent to the difference between the appropriation below the Annual Monetary Commitment and the Annual Monetary Commitment.

## 6.     Use of Annual Monetary Commitment

The Annual Monetary Commitment shall be used exclusively for any costs related to the construction and remediation of curb ramps within the City.  Specifically, the Annual Monetary Commitment shall be used for all work related to design, construction and remediation of curb ramps in connection with New Construction and Alterations, Program Access Improvements, and Curb Ramp

Requests.  When the City constructs curb ramps in connection with the New Construction and Alteration of streets, roadways, or highways, as discussed in Section 7 below, the City shall separately calculate and itemize the cost of curb ramp construction so that it may be credited toward the Annual Monetary Commitment.  In meeting its obligations under this Consent Decree, the City shall retain complete discretion to determine the allocation of the Annual Monetary Commitment among New Construction and Alterations, Program Access Improvements, and Curb Ramp Requests.

**7.** **New Construction and Alterations**

7.1    Throughout the Term of the Consent Decree, the City shall ensure that all Pedestrian Facilities, as well as highways, roadways, and streets that include Pedestrian Walkways, which are newly constructed on or after the Effective Date, include the construction of Accessible Curb Ramps, as required by 28 C.F.R. § 35.151(a) and the 2013 DOJ/DOT Alteration Guidance.

7.2    Throughout the Term of the Consent Decree, whenever the City Alters its Pedestrian Facilities, roadways, highways, and crossings, it will remediate existing but non-Compliant Curb Ramps to be Accessible along the sidewalks adjacent to the Alteration and/or construct new Accessible Curb Ramps where they are lacking, as required by 28 C.F.R. § 35.151(b), except where the City can demonstrate that the construction of Accessible Curb Ramps is Technically Infeasible or not possible due to Structural Impracticability.  In any such circumstance where the construction of an Accessible Curb Ramp is Technically Infeasible or not possible due to Structural Impracticability, the subject curb ramp shall be Accessible to the maximum extent feasible, physical and site constraints shall be addressed with alternative curb ramp designs, and the location of the alternative ramp shall be recorded in the City's curb ramp database, or an alternate database.

7.3    Throughout the Term of the Consent Decree, whenever the City newly constructs or alters Pedestrian Facilities, or adjacent construction projects obstruct the pedestrian right of way, the City shall ensure that accessible temporary routes are provided through and around such projects with appropriate signage directing persons with Mobility Disabilities to such accessible temporary routes.

7.4    Throughout the Term of the Consent Decree, the City shall ensure that all third-party construction, alteration, and development projects that include New Construction or Alterations of

Pedestrian Facilities that require City permits or approvals within the City are performed in compliance with the terms of this Section.

7.5     Nothing in this Consent Decree shall require the City to create crosswalks or designated street crossings where none currently exist.

## 8.     Prioritization of Program Access Improvements

8.1     To the extent practicable, the City shall prioritize the remediation of curb ramps that contain High Priority Curb Ramp Barriers, as set forth in Exhibit B, over those curb ramps that do not contain High Priority Curb Ramp Barriers.  Consistent with 28 C.F.R. § 35.150, all Program Access Improvements, including remediation of curb ramps with and without High Priority Curb Ramp Barriers, shall be prioritized in a manner that gives preference to curb ramps that serve the following facilities in the order below:

a.     City government offices and facilities (including the pedestrian rights of way adjacent to facilities owned or operated by the City, and the paths of travel leading from such adjacent pedestrian rights of way to the primary entrances to such facilities);

b.     Transportation corridors;

c.     Hospitals, medical facilities, assisted living facilities and other similar facilities;

d.     Places of public accommodation such as commercial and business zones;

e.     Facilities containing employers; and

f.     Residential neighborhoods.

8.2     In instances where installation of any Accessible Curb Ramp that falls within the prioritization criteria set forth in Section 8.1 above, would be Technically Infeasible or Structurally Impracticable, the City shall conduct such installation or repair to be Accessible to the maximum extent feasible, and shall consider the extent to which physical or site constraints can be addressed by an alternative curb ramp design or a raised crosswalk that meets applicable federal and state accessibility standards.

728351.35

8.3     Subject to the foregoing provisions of this Section, the City shall retain complete discretion to determine the means and methods of implementing the Program Access Improvements set forth herein.

**9.     City Compliance with Funding Source Requirements**

Nothing in this Consent Decree shall preclude the City from participating in and accepting funding from governmental programs, such as the United States Department of Urban Development's Community Development Block Grant Program, that require the construction of curb ramps at specific locations within the City.

**10.     Transition Plan**

10.1     As soon as possible, but no later than two years after the Effective Date, the San Jose City Council will be presented with an amended ADA Title II Transition Plan for the City Council's adoption, which will update sections 9 and 10 of the Transition Plan.  During this two-year period, the City shall continue to fund and perform curb ramp construction and remediation.

10.2     The Transition Plan amendment will include a schedule for Accessible Curb Ramp construction and remediation that is consistent with this Consent Decree.  The schedule shall be based upon the prioritization criteria in Section 8 above.  To the extent known, the Transition Plan shall take into account locations of planned New Construction or Alterations that trigger the obligation to construct new Accessible Curb Ramps.

10.3     The City shall provide a draft of the amendment to the Transition Plan to Plaintiff's Counsel for their review and comment at least thirty (30) days prior to finalizing the Transition Plan amendment for presentation to City Council for adoption.  The City will meet and confer with Plaintiff's Counsel about any comments Plaintiff's Counsel have on the Transition Plan amendment, and will give good-faith consideration to such comments.  The City shall solicit public comment on the Transition Plan from community members who have Mobility Disabilities.

**11.     Curb Ramp Request System**

11.1     Throughout the Term of the Consent Decree, the City shall maintain a program through which people with Mobility Disabilities may submit requests for the construction and maintenance of Accessible Curb Ramps and the remediation of non-Compliant Curb Ramps ("Curb Ramp Request

System"). Funds for the Curb Ramp Request System shall be appropriated every fiscal year. Plaintiff is permitted to utilize this system on behalf of persons with Mobility Disabilities to submit requests for the construction and maintenance of Accessible Curb Ramps and the remediation of non-Compliant Curb Ramps. Curb Ramp Requests may be submitted through an easily locatable form on the City's website that complies with WCAG, a telephone number, electronic mail, standard mail, and other non-onerous methods for making requests. The request form may require the following information: (i) the requestor's name, address and other contact information; (ii) a statement that the requestor is a person with a Mobility Disability or is making the request on behalf of a person with a Mobility Disability; (iii) the location of the requested curb ramp; and (iv) the method preferred by the requestor to receive the City's response to the Curb Ramp Request (e.g., by telephone, by electronic mail or by standard mail).

11.2    The City shall document receipt of each Curb Ramp Request, assign each request a specific identification number (or other identifying information), and log the request into a software program or other electronic database that records the requestor's name and contact information, the date of the request, and the location of the requested curb ramp construction, remediation, or maintenance. Within ten (10) days of receipt, the City shall notify the requestor that his or her request has been received and provide the requestor with the identification number or other identifying information assigned to the request.

11.3    The City will use Best Efforts to investigate each request within thirty (30) days of its submission. Requests will be reviewed and investigated in the order received. Upon completion of the investigation, the City shall provide the requestor with an estimated date by which the City expects the Accessible Curb Ramp to be constructed, remediated, or maintained. If the City determines that it is unable to fulfill the Curb Ramp Request by the estimated date, it shall notify the requestor as soon as practicable after such determination, but no later than the estimated date initially provided. The City shall also provide the requestor a revised estimated date by which the City expects the Accessible Curb Ramp to be constructed, remediated, or maintained.

11.4    The City shall use Best Efforts to construct each requested Accessible Curb Ramp, or remediate each identified non-Compliant Curb Ramp, within one-hundred twenty (120) days of the

submission of the request.  If the City is unable to fulfill a Curb Ramp Request within 120 days of submission due to the complete expenditure of the Annual Monetary Commitment for the year in which the request was made, the City shall fulfill the Curb Ramp Request as soon as practicable in the next Annual Monetary Commitment period.  Any individual Curb Ramp Request for which the improvements exceed $100,000 in estimated costs shall be a project subject to public bidding, and shall not be subject to the 120-day timeframe.  Curb Ramp Requests shall be addressed in the order received, unless otherwise previously scheduled as part of a planned New Construction or Alteration project to take place within one calendar year of the Request.

11.5    In any such circumstance where the construction of an Accessible Curb Ramp requested pursuant to the City's Curb Ramp Request System would be Technically Infeasible or Structurally Impracticable, the subject curb ramp shall be Accessible to the maximum extent feasible, and physical or site constraints shall be addressed by alternative curb ramp designs.  If the City determines that construction of a requested curb ramp is Technically Infeasible, the City shall notify the requestor that the subject ramp shall be made Accessible to the maximum extent feasible.

11.6    Through the Term of Consent Decree, the City shall maintain a website (https://www.sanjoseca.gov/index.aspx?NID=2499 & https://www.sanjoseca.gov/index.aspx?NID=1888), or an equivalent manner of electronic communication to the general public, which describes the methods for making Curb Ramp Requests and the process and timeline for fulfilling those Requests.  The webpage(s) describing the Curb Ramp Request System shall, at a minimum, be available from an easily findable location on the City's Department of Transportation and Customer Service website homepages and shall comply with WCAG.

**12.    <u>Maintenance</u>**

Throughout the Term of Consent Decree, the City shall maintain all Accessible Pedestrian Facilities over which it has responsibility, ownership or control so that those facilities are readily accessible to and usable by persons with Mobility Disabilities, except for isolated or temporary interruptions in access due to maintenance or repairs.  In circumstances where Accessible Curb Ramps are not available due to maintenance or repairs, the City shall provide an alternative accessible route,

which may be a marginally longer route, and shall identify that alternative route on signage at the subject location.

**13.   Reporting**

13.1    On an annual basis and by the end of the second quarter of each fiscal year of the Consent Decree, the City will provide a written Annual Report to Class Counsel regarding the status of the City's compliance with the terms of the Consent Decree.  The Annual Report shall include summary information detailing the number of Accessible Curb Ramps constructed and/or remediated and their locations, and the number and locations of Accessible Curb Ramps constructed and/or remediated via the Curb Ramp Request System.  Each of the reports shall include the following information, if applicable to the reporting period: (a) dollars appropriated for Accessible Curb Ramps during the reporting period; (b) dollars expended for Accessible Curb ramps during the reporting period; (c) the number of missing curb ramps constructed during the reporting period by City forces and third parties to the extent known by the City; (d) the number of High Priority Curb Ramp Barriers remediated during the reporting period by City forces and third parties to the extent known by the City; (e) the number of Low Priority Curb Ramp Barriers remediated during the reporting period by City forces and third parties to the extent known by the City; (f) a description of the status of all pending Curb Ramp Requests received by the City during the reporting period, including applicable response times; (g) the number of non-compliant curb ramps constructed to the maximum extent feasible, or not constructed, due to Technical Infeasibility or Structural Impracticability.

13.2    Additionally, the City shall ensure that Plaintiff has access to the GIS Database, or equivalent databases, upon Plaintiff's reasonable request throughout the Term of the Consent Decree.

13.3    Within thirty (30) calendar days of City's issuance of the Annual Report to Class Counsel, if so needed, Class Counsel may request to meet with the City via telephone or videoconference, or if reasonable, in person, to discuss the City's efforts to implement the Consent Decree and attempt to resolve any disputes.

14. **Monitoring**

Throughout the Term of the Consent Decree, the City shall notify Plaintiff and Class Counsel of any changes to the City's drawings and/or designs regarding Accessible Curb Ramps, and shall provide Plaintiff and Class Counsel with any updated drawings and/or designs regarding Accessible Curb Ramps.  Plaintiff and Class Counsel may also inspect work being done in the City's pedestrian rights of way to construct Accessible Curb Ramps and remediate non-Compliant Curb Ramps in order to monitor compliance with the Consent Decree.  The City will also make its survey database and curb ramp construction database available to Plaintiff and Class Counsel for their review upon reasonable request.  Notwithstanding the foregoing, any review by Plaintiff and/or Class Counsel shall be undertaken in a manner to assure it will not unreasonably interfere with the City's operations.

15. **Settlement Approval Process**

15.1    This Consent Decree will be subject to approval by the District Court.  However, nothing in this Consent Decree will be deemed to authorize the District Court to change or modify any of its terms.  Any change, modification or rejection of any of the provisions of this Consent Decree by the District Court or any other court will constitute a material modification of this Consent Decree, will prevent the Judgment from becoming final, and will give any Party the right to terminate this Consent Decree in its entirety.

15.2    Within ten (10) days of circulating the fully executed Consent Decree, Plaintiff will file his Complaint in the United States District Court for the Northern District of California ("*Lashbrook* Action").  The Parties will then jointly move the court for preliminary approval of this Consent Decree, certification of the Settlement Class as defined in Section 2.19 of this Consent Decree, appointment of Class Counsel and Plaintiff Lashbrook to represent the Settlement Class, and approval of the form and content of notice (substantially in the form attached to this Consent Decree as Exhibit C) and a plan for distribution of notice to the Settlement Class.  Along with their joint motion for preliminary approval, the Parties will submit the proposed Preliminary Approval Order attached to this Consent Decree as Exhibit D (the "Preliminary Approval Order.").

728351.35

15.3    The Parties agree that the Settlement Class will be certified in accordance with the standards applicable under Rule 23(b)(2) of the Federal Rules of Civil Procedure and that, accordingly, no Settlement Class member may opt out of any of the provisions of this Consent Decree.

15.4    Following the District Court's issuance of the Preliminary Approval Order, the Parties will circulate the Notice of Settlement, advising the members of the Settlement Class of the terms of the proposed Consent Decree and their right to object to the proposed Consent Decree.  This Notice will be published as follows:

a.    Within thirty (30) days after the District Court has issued the Preliminary Approval Order, the City will cause Notice of the Settlement to be published once each week for four (4) consecutive weeks in The San Jose Mercury News.  The City will also cause Notice of the Settlement to be published in additional publications as the District Court may order.

b.    The Notice will include the terms required by the District Court, which are anticipated to be as follows: (i) a brief statement of the *Lashbrook* Action, the settlement embodied in this Consent Decree, and the claims released by the Settlement Class; (ii) the date and time of the fairness hearing and/or final approval hearing of the proposed Consent Decree; (iii) the deadline for submitting objections to the proposed Consent Decree; and (iv) the web page, address, and telephone and fax numbers that may be used to obtain a copy of the Notice of Settlement.  The City will pay the costs for the publication of the Notice.

c.    Within twenty (20) days after the District Court has issued the Preliminary Approval Order, the City will cause a copy of the Notice of Settlement to be posted and remain posted on the City's official website (www.sanjoseca.gov) for four (4) consecutive weeks.  The website will also make a copy of the Notice of Settlement available in English, Spanish, and Vietnamese, and in an accessible electronic format that can be recognized and read by software commonly used by individuals with visual impairments to read web pages.  All pages or content on these websites that are part of the process for accessing the information in the Notice of Settlement will comply with WCAG. The City will pay the costs for the publication of the Notice.

728351.35

d.      Within ten (10) days after the District Court has issued the Preliminary Approval Order, Class Counsel will cause a copy of the Notice of Settlement to be provided (via email or U.S. Mail) to the organizations listed on Exhibit E to this Consent Decree.

e.      Within twenty (20) days after the District Court has issued the Preliminary Approval Order, each firm making up Class Counsel will post on its website a copy of the Notice of Settlement in English, Spanish, and Vietnamese, and in an accessible electronic format that can be recognized and read by software commonly used by individuals with visual impairments to read web pages.  In addition, the websites will provide information about how Settlement Class Members may obtain a copy of the Consent Decree.  All pages or content on the websites that are part of the process for accessing the information in the notice will comply with WCAG.

15.5    Prior to the fairness hearing, and as directed by the District Court, Plaintiff will file a motion for an award of attorneys' fees, expenses and costs, and a motion for a service award of $5,000 to Plaintiff Lashbrook.  The City has agreed not to oppose Plaintiff's requested service award of $5,000, however, it reserves the right to oppose Plaintiff's motion for attorneys' fees, expenses, and costs, as set forth in Section 20.  Plaintiff will also file a motion requesting that the District Court schedule and conduct a fairness hearing to decide whether the Court will grant final approval of the Consent Decree, as set forth below.

15.6    At the fairness hearing, the Parties will jointly move for entry of the Judgment (substantially in the form as attached to this Consent Decree as Exhibit F) providing for: (i) final approval of this Consent Decree as fair, adequate, and reasonable; (ii) final certification of the Settlement Class for settlement purposes only; (iii) final approval of the form and method of notice of the Judgment to the Settlement Class; (iv) final approval of the appointment of Class Counsel for the Settlement Class; (v) final approval of the appointment of Plaintiff Lashbrook as class representative of the Settlement Class; (vi) final approval of the release of the City from the Released Claims, defined in Section 18, below; (vii) final approval of an order that the Settlement Class members will be enjoined and barred from asserting any of the Released Claims against the City following entry of Judgment and up to and including the completion of the Term; (viii) the Parties and all members of the Settlement

1   Class to be bound by the Judgment; and (ix) the District Court's retention of jurisdiction over the

2   Parties to enforce the terms of the Judgment throughout the Term of this Consent Decree.

3          15.7    Members of the Settlement Class will have an opportunity to object to the proposed

4   Consent Decree but may not opt-out.  The Parties will request that the District Court order the

5   following procedures for assertion of objections, if any, to the Consent Decree:

6                  a.      Any Settlement Class member may object to this Consent Decree by filing,

7   within forty-five (45) calendar days of the commencement of the issuance of the Notice to the

8   Settlement Class, written objections with the District Court.

9                  b.      With respect to any and all objections to this Consent Decree received by Class

10  Counsel, Class Counsel will provide a copy of each objection to counsel of record for the City, by

11  messenger delivery or electronic-mail delivery, within two (2) court days after receipt of such

12  objection.

13                 c.      Responses by Class Counsel and/or the City to any timely-filed objections may

14  be filed with the District Court no less than five (5) days before the fairness hearing, or as otherwise

15  ordered by the Court.

16         15.8    The Parties will take all procedural steps regarding the fairness hearing that may be

17  requested by the District Court and will otherwise use their respective Best Efforts to consummate the

18  settlement embodied in this Consent Decree, and to obtain approval of this Consent Decree, and entry

19  of the Judgment.

20         15.9    The Parties agree that, upon final approval, the District Court will enter the Judgment

21  under Rule 54(b) of the Federal Rules of Civil Procedure (substantially in the form attached to this

22  Consent Decree as Exhibit F) dismissing the *Lashbrook* Action with prejudice, subject to the District

23  Court retaining jurisdiction to resolve any Dispute regarding compliance with this Consent Decree that

24  cannot be resolved through the Dispute Resolution Process set forth below, and to rule on Plaintiff's

25  motion for reasonable attorneys' fees and costs.

26         15.10   The City will not assert, after the Judgment has become final, that the District Court

27  lacks jurisdiction to enforce the terms of this Consent Decree, or raise any jurisdictional defense to any

28  enforcement proceedings permitted under the terms of this Consent Decree.

728351.35

15.11   Should the District Court deny the Parties' request to enter the Judgment, should this Consent Decree not receive final approval by the District Court for any reason, or should this Consent Decree not become final for any reason in accordance with its terms:  (i) this Consent Decree will be null and void and of no force and effect; (ii) nothing in this Consent Decree will be deemed to prejudice the position of any of the Parties with respect to any matter; and (iii) neither the existence of this Consent Decree, nor its contents, will be admissible in evidence, referred to for any purpose in any litigation or proceeding, or be deemed an admission by the City of any fault, wrongdoing or liability.

15.12   This Consent Decree, upon final approval, will be binding upon the City, Plaintiff, and all Settlement Class members and, to the extent specifically set forth in this Consent Decree, upon Class Counsel; will extinguish all Released Claims; and will constitute the final and complete resolution of all issues addressed herein.  This Consent Decree is the complete and final disposition and settlement of any and all Released Claims.

**16.    Dispute Resolution**

16.1    If any Party believes that a dispute exists relating to any violation of or failure to perform any of the provisions of this Consent Decree, it shall notify the other Party in writing and describe the alleged violation or failure to perform with particularity.  The Party alleged to have committed the violation or failure to perform shall provide a written response within ten (10) business days of receipt of such notice, and shall have a period of thirty (30) days to cure the alleged violation or failure to perform.  In the event the alleged violation cannot reasonably be cured within thirty (30) days, the Parties shall meet and confer to attempt to agree on an appropriate period of time required to cure the alleged violation or failure to perform.  If the Party alleging a violation or failure to perform maintains that the violation or failure to perform has not been cured, the Parties shall meet and confer, in person or by telephone, and attempt to resolve the dispute on an informal basis for a period of at least thirty (30) days.  The Parties shall exchange relevant documents and/or other information and engage in informal discovery in an attempt to resolve the issues in dispute.  As part of the meet and confer process under Section 27, such informal discovery may also include, but is not limited to, interviewing witnesses and experts and exchange of additional information or supporting

documentation.  Any disagreement about information to be provided shall be handled pursuant to Sections 16.2 to 16.4.

16.2     If the Parties are unable to resolve a dispute through the meet and confer process described in Section 16.1 above, the Parties shall mediate the dispute.  The Parties shall have thirty (30) days to jointly select a mediator.  The mediation shall be conducted in the manner determined by the mediator, and the Parties shall engage in good faith efforts to resolve the dispute through such mediation.

16.3     If the Parties are unable to resolve a dispute regarding either Party's performance under the Consent Decree through the mediation process described in the Section 16.2 above, either Party may provide the other with written notice of its intent to enforce the Consent Decree.  Thereafter, either Party may file a motion with the District Court to enforce the Settlement Consent Decree.

16.4     The terms of this Consent Decree shall be construed pursuant to the laws of the State of California with respect to principles of common law contract interpretation, and in accordance with the substantive law of ADA, Section 504, and Section 11135, as applicable.

## 17.   Named Plaintiff Payment

In exchange for the Release of Claims set forth in Section 19, below, and for all services he rendered to the Settlement Class, and conditioned upon the District Court granting final approval of the Consent Decree as well as Plaintiff's application for a service award to Plaintiff Lashbrook in the amounts set forth in this Section, within thirty (30) days of the Effective Date, the City will pay Plaintiff Lashbrook $50,000.  This payment shall be in full and final settlement of Plaintiff Lashbrook's claims that are being released in Sections 18 & 19, and represents payment for personal injuries sustained by Plaintiff Lashbrook while travelling on the City's Pedestrian Walkways and curb ramps.

## 18.   Release of Class Claims

Effective upon entry of judgment on final approval of the Consent Decree by the District Court and in consideration for the City's commitments set forth in the Consent Decree, Plaintiff and Class Members, on behalf of themselves and their respective heirs, assigns, successors, executors, administrators, agents, and representatives ("Releasing Parties") will, upon the Effective Date, fully

and finally release, acquit, and discharge the City from any and all claims, allegations, demands, charges, complaints, actions, lawsuits, rights, liabilities, losses, injuries, obligations, disputes and causes of action of any kind, and whether known or unknown, suspected or unsuspected, asserted or unasserted, or actual or contingent, for injunctive, declaratory, or other non-monetary relief, however described, that were brought, could have been brought, or could be brought now or in the future by the Releasing Parties relating to or arising from any of the City's alleged actions, omissions, incidents, or conduct related to the construction, remediation, repair, or maintenance of curb ramps in the City's pedestrian right of way at any time prior to the Effective Date and through the end of the Term of Consent Decree (the "Released Claims").  Such Released Claims, however, shall not include any claims to enforce the terms of the Consent Decree, any claims for relief arising from the City's violation of any term of the Consent Decree, or any claims related to monetary damages, personal injuries, or property damage, except as set forth in Section 19, below.  Such Released Claims exclude any claims based on or arising from missing or non-Compliant curb ramps that remain in existence after the expiration of the Term of Consent Decree.  In addition, as explained in the Recitals above, the Releases contained herein only cover curb ramps on the City's street segments with Pedestrian Walkways and do not apply to components of the City's sidewalk system other than curb ramps.

**19.**   **Release of Plaintiff Lashbrook's Damages Claims**

In addition to the Released Claims set forth in Section 18, Plaintiff Lashbrook also releases the City from any and all claims arising at any time prior to the Effective Date for monetary relief relating to or arising from any of the City's alleged actions, omissions, incidents, or conduct related to the installation, remediation, repair, or maintenance of curb ramps in the City's pedestrian right of way. Section 1542 of the Civil Code of the State of California provides as follows:

> **"A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party."**

Plaintiff represents that Civil Code Section 1542 has been read and reviewed with counsel and understood, and that he hereby waives any and all present and future rights and benefits under Section 1542 to the extent it would permit claims relating to, arising out of, or any way connected to the claims

released by Plaintiff based on facts found to be different from the facts believed to be true at the time this Consent Decree was executed.

**20.      Attorneys' Fees, Costs & Expenses Up to the Effective Date**

Within thirty (30) days of the Effective Date, and conditioned upon the District Court granting final approval of the Consent Decree as well as Plaintiff's application for an award of attorney's fees, expenses, and costs in the amounts set forth in this Section, the City shall deliver payment in the amount of $734,627.50 ($722,327.50 in fees and $12,300 in costs) to Plaintiff's Counsel for the full amount of their reasonable attorneys' fees, costs, and expenses in connection with this matter incurred up to the Effective Date.  No additional amounts shall be owed to Plaintiff or their Counsel in attorney's fees, expenses, or costs for time or expenses incurred up to the Effective Date.

**21.      Attorneys' Fees, Expenses and Costs for Implementing the Consent Decree.**

Subject to the following terms, the City shall pay Class Counsel their reasonable attorneys' fees, expenses, and costs incurred between the Effective Date and the expiration of the Term of Consent Decree for performing all work reasonably necessary to monitor, implement, and administer the Consent Decree.

21.1      On June 30, 2021 and annually thereafter during the Term of the Consent Decree, Class Counsel shall submit to the City a statement of reasonable attorneys' fees, expenses, and costs incurred during the prior 12-month period for performing all work reasonably necessary to monitor, implement, and administer the Consent Decree, including reviewing the Annual Report provided for in Section 13.1 for confirmation that the City has met its obligations under this Consent Decree subject to a maximum amount of $75,000 per year for years 2020 through 2022, and a maximum amount of $50,000 per year for years 2023 through the expiration of the Term of the Consent Decree ("Annual Monitoring Fees Cap").  Class Counsel shall not seek more than $10,000 per year in attorneys' fees for the limited tasks of reviewing the Annual Report and any brief telephonic conferences necessary to confirm compliance with the Consent Decree.  Any required follow-up and/or meet and confer work will be subject to the Annual Monitoring Fees Cap and not the $10,000 limit.  The Annual Monitoring Fees Cap and the $10,000 limit for review of the Annual Report are stated in 2019 dollars, and shall be adjusted annually based on the Consumer Price Index for the San Francisco Area as calculated by the

United States Bureau of Labor Statistics. Where Plaintiff's reasonable attorneys' fees, costs, and expenses are less than the Annual Monitoring Fees Cap for 2020 through 2022, the remainder shall be set aside for use in years 2023 and 2024 of this Consent Decree ("Banked Remainder") during which Plaintiff's attorneys' fees, costs, and expenses exceed the Annual Monitoring Fees Cap. The Annual Fees Cap and the Banked Remainder available for use in years 2023 and 2024 shall be no more than $75,000 for each of those two years. Each statement submitted to the City pursuant to this Consent Decree shall be supported by a description of services by date and by biller.

21.2    The City shall review each statement submitted, and shall pay those amounts it determines in good faith were reasonably incurred by Class Counsel within sixty (60) days of the date the City receives each such statement. Any objections or disputes regarding the statement shall be handled pursuant to the Dispute Resolution procedure set forth in Section 16 of this Consent Decree.

21.3    The City shall pay Class Counsel their reasonable attorneys' fees, expenses, and costs incurred between the Effective Date and the expiration of the Term of Consent Decree for performing all work reasonably necessary to resolve Disputes under Sections 16 and 27 of this Consent Decree. Class Counsel's attorneys' fees, expenses and costs for Disputes under Section 16 shall be subject to a maximum amount of $100,000 per Dispute whereas those for Disputes under Section 27 shall subject to a maximum amount of $250,000 per dispute. The $250,000 and $100,000 maximum amounts are stated in 2019 dollars, and shall be adjusted annually based on the Consumer Price Index for the San Francisco Area as calculated by the United States Bureau of Labor Statistics. Class Counsel shall provide the City with a statement of reasonable attorneys' fees, expenses, and costs incurred for each dispute, supported by a description of services by date and by biller. The City shall review each statement and pay the amounts in compliance with the Section 21.2.

21.4    In the event either Party finds that it is necessary to seek resolution of a dispute through a motion for enforcement before the District Court, the prevailing party shall be entitled to reasonable attorneys' fees, costs, and expenses in accordance with the standards of the ADA and *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421-22 (1978).

**22.      Drafting of this Consent Decree**

The Parties acknowledge and agree that this Consent Decree shall for all purposes be deemed jointly-drafted and fully-negotiated, and as a result, shall not in any manner be interpreted in favor of, or as against, any particular Party by reason of being the drafting Party.  Any rule of law that would require interpretation of any ambiguities or uncertainties in this Consent Decree against one of the Parties, shall have no application and is hereby expressly waived.

**23.    Voluntary Agreement**

Each of the Parties represents, warrants and agrees that he, she or it has read this Consent Decree carefully, and knows and understands its contents, that this Consent Decree has been voluntarily entered into, that he, she or it has received independent legal advice from his, her or its attorneys with respect to the advisability of executing this Consent Decree, and that any and all investigation and analysis of the facts deemed necessary or desirable have been conducted prior to the execution of this Consent Decree.

**24.    Binding Effect**

All of the terms and provisions of this Consent Decree shall be binding upon and shall inure to the benefit of the Parties, their heirs, successors, and assigns.

**25.    Authority**

Each of the Parties represents, warrants and agrees that he, she or it has the full right and authority to enter into this Consent Decree, and that the person executing this Consent Decree has the full right and authority to commit and bind such Party.

**26.    City Council Approval**

The Parties understand and agree that this Consent Decree is subject to review and approval by the City Council for the City of San Jose, and that the City shall have no obligation hereunder unless and until such approval is obtained.  In the event the City Council for the City of San Jose declines to approve this Consent Decree, this Consent Decree shall be null and void and all obligations hereunder shall cease.  The Parties shall be returned to the status quo existing on the date this Consent Decree was signed.  The City shall submit this Consent Decree to the City Council as soon as possible after the Parties' and Parties' Counsel's execution of same, but no later than thirty (30) days after execution.

**27.    Elimination of Funding Sources**

728351.35

The Parties shall adhere to the following procedures in the event that the following two funding sources are eliminated by local or statewide ballot measure, act of the California State Legislature, or court order: 1) Measure B – City of San Jose – Sales Tax; or 2) the Road Repair and Accountability Act of 2017 (SB 1 – 2017-18 California legislative session).

27.1     As early as practicable, the City shall notify Class Counsel of the possibility that it may be unable to appropriate the Annual Monetary Commitment due to the elimination of funding from Measure B or the Road Repair and Accountability Act of 2017.  The City shall also notify Class Counsel of the date by which the funding will terminate.

27.2     The City shall use Best Efforts to locate alternate funding sources to fulfill the Annual Monetary Commitment.  Pursuant to Class Counsel's request, and as soon as practicable thereafter, the City shall generate a written statement identifying potential resources that could be available for use in funding the Annual Monetary Commitment.  Consistent with the City's existing budgetary process, any future identified funding sources used to satisfy the Annual Monetary Commitment are subject to the approval of the City Council.

27.3     If the Parties are unable to reach agreement on the use of alternate funding sources, the Parties shall attempt to resolve any disputes through the Dispute Resolution process set forth in Section 16.  The City's obligation to appropriate and expend the Annual Monetary Commitment for future years shall be suspended during the Dispute Resolution process.

27.4     If the Parties are unsuccessful in resolving their disputes through the Dispute Resolution process, Plaintiff shall be entitled to conduct discovery pursuant to the Federal Rules of Civil Procedure regarding the City's financial status and ability to appropriate the Annual Monetary Commitment, and may file a motion with the District Court to enforce or modify the Consent Decree. If Plaintiff's motion is denied, or denied in part, Plaintiff, in his sole discretion, may seek court approval to terminate the Consent Decree and litigate Plaintiff's claims on behalf of himself and the currently defined Settlement Class arising from the lack of Accessible curb ramps throughout the City's pedestrian right of way.  If litigation is commenced pursuant to this subsection, the City agrees to the following: 1) the currently defined Settlement Class shall be certified pursuant to Federal Rule of

Civil Procedure 23(b)(2) for purposes of such future litigation; and 2) the City shall continually maintain and fund the Curb Ramp Request System, as set forth in Section II.11, through at least 2038.

**28.**     **Force Majeure**

The obligations of the City with respect to constructing or remediating Accessible Curb Ramps at a particular location may also be postponed if the postponement is caused by or attributable to a force majeure (that is, due to acts of God, war, government regulations (other than regulations by the City), terrorism, disaster (including power outages), strikes, civil disorder, government declared fiscal emergency, an emergency beyond the City's control that make it illegal or impossible for the City to perform construction, alteration, or repair work).  Under this provision, the City's obligations may be tolled for the period of the force majeure's effect.

**29.**     **Paragraph Headings**

The headings, or lack thereof, preceding each of the paragraphs in this Consent Decree are for convenience only, and shall not be considered in the Consent Decree's construction or interpretation.

**30.**     **Counterparts**

This Consent Decree may be executed by the Parties in separate counterparts, and all such counterparts taken together shall be deemed to constitute one and the same Consent Decree.

**31.**     **Notices**

For Plaintiff:

> Linda M. Dardarian
> Andrew P. Lee
> GOLDSTEIN, BORGEN, DARDARIAN & HO
> 300 Lakeside Drive, Suite 1000
> Oakland, CA  94612
> 510-763-9800
>
> Timothy Fox
> CIVIL RIGHTS EDUCATION AND
> ENFORCEMENT CENTER
> 1245 E. Colfax Avenue, Suite 400
> Denver, CO  80218
> 303-757-7901

728351.35

1   For the City of San Jose:

2       Jon Calegari
3       Office of the City Attorney
        City of San Jose
4       200 East Santa Clara Street
        San Jose, CA 95113-1905
5       408-535-1900

6       IN WITNESS WHEREOF, the Parties hereto have approved and executed this Consent Decree

7   on the dates set forth opposite their respective signatures.

8       EXECUTED by the Parties as follows:

9
    DATED: _____, 2020          THE CITY OF SAN JOSE
10

11                                        By: _____
12

13                                        Its: _____
14                                        PLAINTIFF
15

16  DATED:  _April 2_____, 2020          By: _____
17                                        Artie Lashbrook

18  **APPROVED AS TO FORM:**

19  DATED: _____, 2020          GOLDSTEIN BORGEN DARDARIAN & HO
20

21                                        By: _____
22                                            Linda M. Dardarian
                                              Attorneys for Plaintiff
23  DATED: _____, 2020          CIVIL RIGHTS EDUCATION AND
24                                        ENFORCEMENT CENTER
25

26                                        By: _____
                                              Tim Fox
27                                            Attorneys for Plaintiff

28

1  For the City of San Jose:

2          Jon Calegari
           Office of the City Attorney
3          City of San Jose
           200 East Santa Clara Street
4          San Jose, CA 95113-1905
           408-535-1900
5

6          IN WITNESS WHEREOF, the Parties hereto have approved and executed this Consent Decree

7  on the dates set forth opposite their respective signatures.

8          EXECUTED by the Parties as follows:

9

10 DATED:  ___April 16____, 2020        THE CITY OF SAN JOSE

11                                                                        *electronically*
                                      By: __/s/ Richard Doyle___ *signed*

12                                           RICHARD DOYLE

13                                      Its: _____City Attorney_____

14                                      PLAINTIFF

15

16 DATED: _____, 2020        By: _____
                                           Artie Lashbrook
17

18 **APPROVED AS TO FORM:**

19 DATED: _*April 3*___, 2020         GOLDSTEIN BORGEN DARDARIAN & HO

20

21                                      By: *Linda M. Dardarian (APL)*

22                                           Linda M. Dardarian
                                           Attorneys for Plaintiff
23

24 DATED: ___April 3___, 2020         CIVIL RIGHTS EDUCATION AND
                                      ENFORCEMENT CENTER
25
                                      By: _____
26                                           Tim Fox
                                           Attorneys for Plaintiff
27

28

728351.35

1   DATED:  April 15, 2020                    THE CITY OF SAN JOSE

2
                                                          electronically
3                                        By:   /s/ Jon Calegari      signed
                                              _____
4                                             Jon Calegari
                                              Attorneys for the City of San Jose
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

728351.35

Exhibit A



**U.S. Department of Justice**
Civil Rights Division
*Disability Rights Section*



U.S. Department of Transportation
**Federal Highway Administration**

# Department of Justice/Department of Transportation Joint  Technical Assistance[1] on the Title II of the Americans with Disabilities Act Requirements to Provide Curb Ramps when Streets, Roads, or Highways are Altered through Resurfacing

Title II of the Americans with Disabilities Act (ADA) requires that state and local governments ensure that persons with disabilities have access to the pedestrian routes in the public right of way. An important part of this requirement is the obligation whenever streets, roadways, or highways are *altered* to provide curb ramps where street level pedestrian walkways cross curbs.[2]  This requirement is intended to ensure the accessibility and usability of the pedestrian walkway for persons with disabilities.

An alteration is a change that affects or could affect the usability of all or part of a building or facility.[3]  Alterations of streets, roads, or highways include activities such as reconstruction, rehabilitation, *resurfacing*, widening, and projects of similar scale and effect.[4]  Maintenance activities on streets, roads, or highways, such as filling potholes, are not alterations.

Without curb ramps, sidewalk travel in urban areas can be dangerous, difficult, or even impossible for people who use wheelchairs, scooters, and other mobility devices. Curb ramps allow people with mobility disabilities to gain access to the sidewalks and to pass through center islands in streets. Otherwise, these individuals are forced to travel in streets and roadways and are put in danger or are prevented from reaching their destination; some people with disabilities may simply choose not to take this risk and will not venture out of their homes or communities.

Because resurfacing of streets constitutes an alteration under the ADA, it triggers the obligation to provide curb ramps where pedestrian walkways intersect the resurfaced streets.  See Kinney v. Yerusalim, 9 F 3d 1067 (3rd Cir. 1993).   This obligation has been discussed in a variety of technical assistance materials published by the Department of Justice beginning in 1994.[5]  Over the past few years, state and local governments have sought further guidance on the scope of the alterations requirement with respect to the provision of curb ramps when streets, roads or highways are being resurfaced.  These questions have arisen largely due to the development of a variety of road surface treatments other than traditional road resurfacing, which generally involved the addition of a new layer of asphalt.  Public entities have asked the Department of Transportation and the Department of Justice to clarify whether particular road surface treatments fall within the ADA definition of alterations, or whether they should be considered maintenance that would not trigger the obligation to provide curb ramps.  This Joint Technical Assistance addresses some of those questions.

### Where must curb ramps be provided?

Generally, curb ramps are needed wherever a sidewalk or other pedestrian walkway crosses a curb. Curb ramps must be located to ensure a person with a mobility disability can travel from a sidewalk on one side of the street, over or through any curbs or traffic islands, to the sidewalk on the other side of the street. However, the ADA does not require

installation of ramps or curb ramps in the absence of a pedestrian walkway with a prepared surface for pedestrian use. Nor are curb ramps required in the absence of a curb, elevation, or other barrier between the street and the walkway.

**When is resurfacing considered to be an alteration?**

Resurfacing is an alteration that triggers the requirement to add curb ramps if it involves work on a street or roadway spanning from one intersection to another, and includes overlays of additional material to the road surface, with or without milling.  Examples include, but are not limited to the following treatments or their equivalents: addition of a new layer of asphalt, reconstruction, concrete pavement rehabilitation and reconstruction, open-graded surface course, micro-surfacing and thin lift overlays, cape seals, and in-place asphalt recycling.

**What kinds of treatments constitute maintenance rather than an alteration?**

Treatments that serve solely to seal and protect the road surface, improve friction, and control splash and spray are considered to be maintenance because they do not significantly affect the public's access to or usability of the road. Some examples of the types of treatments that would normally be considered maintenance are:  painting or striping lanes, crack filling and sealing, surface sealing, chip seals, slurry seals, fog seals, scrub sealing, joint crack seals, joint repairs, dowel bar retrofit, spot high-friction treatments, diamond grinding, and pavement patching.  In some cases, the combination of several maintenance treatments occurring at or near the same time may qualify as an alteration and would trigger the obligation to provide curb ramps.

**What if a locality is not resurfacing an entire block, but is resurfacing a crosswalk by itself?**

Crosswalks constitute distinct elements of the right-of-way intended to facilitate pedestrian traffic.  Regardless of whether there is curb-to-curb resurfacing of the street or roadway in general, resurfacing of a crosswalk also requires the provision of curb ramps at that crosswalk.

---

1 The Department of Justice is the federal agency with responsibility for issuing regulations implementing the requirements of title II of the ADA and for coordinating federal agency compliance activities with respect to those requirements.  Title II applies to the programs and activities of state and local governmental entities. Title II applies to the programs and activities of state and local governmental entities. The Department of Justice and the Department of Transportation share responsibility for enforcing the requirements of title II of the ADA with respect to the public right of way, including streets, roads, and highways.

2 See 28 CFR 35.151(*i*)(1) (Newly constructed or altered streets, roads, and highways must contain curb ramps or other sloped areas at any intersection having curbs or other barriers to entry from a street level pedestrian walkway) and 35.151(i)(2) (Newly constructed or altered street level pedestrian walkways must contain curb ramps or other sloped areas at intersections to streets, roads, or highways).

3 28 CFR 35.151(b)(1).

4 2010 ADA Accessibility Standards, section 106.5.

5 See 1994 Title II Technical Assistance Manual Supplement, Title II TA Guidance:  The ADA and City Governments: Common Problems; and ADA Best Practices Tool Kit for State and Local Governments: Chapter 6, Curb Ramps and Pedestrian Crossings under Title II of the ADA, available at ada.gov.

The Americans with Disabilities Act authorizes the Department of Justice (the Department) to provide technical assistance to individuals and entities that have rights or responsibilities under the Act. This document provides informal guidance to assist you in understanding the ADA and the Department's regulations.

This guidance document is not intended to be a final agency action, has no legally binding effect, and may be rescinded or modified in the Department's complete discretion, in accordance with applicable laws. The Department's guidance documents, including this guidance, do not establish legally enforceable responsibilities beyond what is required by the terms of the applicable statutes, regulations, or binding judicial precedent.

July 8, 2013

Exhibit B

### High Priority Curb Ramp Barriers

1.      <u>Curb ramp is not provided</u>: When a curb ramp is not provided where required, it excludes persons who cannot negotiate steps.

2.      <u>Curb ramp width less than 32 inches</u>: 32 inches is the minimum allowable constricted width of an accessible route of travel under any circumstances.  Standards for accessible design limit constrictions in the accessible route of travel to a minimum of 32 inches wide, as long as they do not extend more than 24 inches in length, and any series of such constrictions are separated by at least 48 inches of non-constricted route.  A curb ramp, however, is typically about 72 inches to 96 inches long, which is considerably longer than the 24-inch length that standards allow for constrictions in accessible routes.  Curb ramps that are less than 32 inches wide require the user of a mobility device to exercise an unreasonably high level of precision in guiding her mobility device so that it travels within the constricted width, particularly at the bottom of the curb ramp where side flares create raised bottom transitions at each side of the width of the ramp.  Accordingly, curb ramps that are less than 32 inches in width are high priority.

3.      <u>Running slope exceeding 10.0%</u>: Curb ramps are customarily 6 to 8 feet long where curbs are 6 to 8 inches in height.  A 10% running slope is too steep to for a user of a mobility device to safely descend with sufficient control of speed and direction, particularly when faced with the abrupt change in slope at the bottom landing.  A 10% running slope also requires significantly more strength to ascend.  The United States Access Board settled on a maximum curb ramp running slope of 1:12 (8.33%) as a compromise between steepness and length of ramp.  Even marginal increases beyond 8.33% running slope exclude many users.  Accordingly, curb ramps with running slopes exceeding 10.0% are high priority.

4.      <u>Ramp cross slope more than 4.0%</u>: Allowable ramp cross slope cannot exceed 1:48 (2.08%). 4.0% is nearly twice the allowable cross slope and, when combined with a simultaneous running slope, greatly increases the difficulty of controlling direction while ascending or descending a curb ramp.  A cross slope of 4.0% places a typical 27 wide inch wheelchair at least 1.125 inches lower on one side than the other, which can direct the user's mobility device away from the intended direction of travel.  In addition, a 4.0% cross slope can destabilize users of mobility devices that require balance, such as crutches, braces, canes and walkers.  Accordingly, curb ramps with cross slopes exceeding 4.0% are high priority.

5.      Bottom curb ramp transition (i.e., "bottom lip," raised edge, gap between concrete and pavement):  Non-flush transitions of any height can cause jarring for those using wheeled mobility devices as they transition from one slope to another, and depending on severity can cause users to be thrown from their devices.  Vertical edges can also trip those who have difficulty lifting their feet when they walk.  Standards governing the transition at the bottom of curb ramps are stricter than those governing changes in level along general accessible routes (flush for curb ramps, 0.25 inches high for general accessible routes).  Accordingly, curb ramps with lips are high priority.

6.      Counter slope more than 10.0%:  Counter slope is one of the three aspects affecting the abruptness of the transition at the bottom of the curb ramp.  Counter slopes occur where the curb ramp meets the roadway, where pedestrians come in contact with vehicular traffic.  Standards prohibit counter slope exceeding 5.0%.  Counter slopes steeper than 10% can be significant hazards for pedestrians with mobility disabilities because they can cause jarring, instability, and divert the pedestrian's attention from oncoming vehicular traffic while the pedestrian is focusing on navigating the barrier.  Accordingly, curb ramps with a counter slope exceeding 10.0% are high priority.

7.      Side flare slope exceeding 12.5% where top landing is provided: Curb ramp side flares are components of perpendicular and diagonal curb ramps.  It is common for some persons with mobility disabilities to utilize the side flares as the running slope.  Standards prohibit side flares steeper than 10.0%.  Steep side flares are problematic for the same reasons as steep running slopes.  Although a person with a mobility disability is not forced to use a curb ramp side flare if a top landing is provided, the person may use it anyway because they may expect it to be compliant, and the excessive steepness of the slopes may be difficult to visually discern even under good conditions.  Accordingly, curb ramps with side flares that exceed 12.5% in slope where a top landing is provided are high priority.

8.      Side flare slope exceeding 10.0% where top landing is not provided: When a top landing at a diagonal or perpendicular curb ramp is not provided, or it is less than 32 inches, or has a cross slopes exceeding 4.0%, or a running slope exceeding 12.5%, or has a vertical edge exceeding 0.75 inch, or has a gap exceeding 1.0 inch, the curb ramp does not have a usable top landing.  In those circumstances a person with a mobility disability is forced to use the side flare as the ramp's running slope.  As discussed above, a 10% running slope is too steep to

safely descend with sufficient control of speed and direction, particularly when faced with the abrupt change in slope at the bottom landing.  A 10% running slope also requires significantly more strength to ascend.  Accordingly, curb ramps with side flares that exceed 10% in slope where a top landing is not provided are high priority.

9.      Gaps and vertical edges on the ramp surface: Gaps can trap the caster wheels of wheelchairs and the bottoms of crutches, canes, braces and walkers, causing users of these devices to experience jarring or discomfort, be stopped abruptly and fall down, or be thrown from a wheeled mobility device.  Gaps and vertical edges on the surfaces of sloping ramps have a higher potential for causing difficulty and potential injury because they require more attention and skill to negotiate while simultaneously negotiating a ramp slope. Accordingly, curb ramps with gaps greater than 1 inch located on the ramp surface are high priority.

10.      Parallel curb ramp bottom level area slopes more than 4.0%: Standards prohibit the bottom landing slope on parallel ramps from exceeding 2.08% in any direction.  This is because a person traveling down a parallel curb ramp must not only regain control of their momentum after descending, but must immediately make a 90° turn on the bottom landing in order to head into the street crossing.  Similarly, a person ascending the ramp must make a 90° turn and orient themselves properly to ascend.  Moreover, this landing is short.  The landing at the bottom of the parallel curb ramp is only required to be 48 inches long, whereas bottom landings for pedestrian ramps are required to be at least 72 inches long.  This maneuver requires a high level of precision and skill for users of mobility devices when the cross slope exceeds 4.0%.  Given the 27-inch width of a standard wheelchair, an excessive bottom landing slope will cause one side of the wheelchair to be at least 1.125 inches lower than the other side, which can cause instability.  Accordingly, parallel curb ramps that have bottom landings with slopes that exceeded 4.0% in any direction are high priority.

11.      Parallel curb ramp top landing cross slope more than 4.0%: Standards prohibit the top landings of parallel curb ramps from having cross slopes that exceed 2.08%. Parallel curb ramps do not have side flares, therefore any person using one must utilize the top landing in order to orient and prepare to descend the ramp, or regain control after ascending the ramp.  As explained above in the preceding paragraph, landings with cross slopes exceeding 4.0% result in one side of a wheelchair being at least 1.125 inches lower than the other side, and

this can cause significant instability at the moment just prior to ascending or descending the curb ramp. Accordingly, parallel curb ramps that have top landings with cross slopes that exceeded 4.0% in any direction are high priority.

12.    Parallel curb ramp top landing running slope more than 10.0%: Standards prohibit the top landings of parallel curb ramps from having running slopes that exceed 5.0%. Parallel curb ramps do not have side flares, therefore any person using one must utilize the top landing in order to orient and prepare to descend the ramp, or regain control after ascending the ramp. Landings with running slopes exceeding 10.0% are steeper than the ramp itself and this can cause instability at the moment just prior to descent. Accordingly, parallel curb ramps that have top landings with running slope that exceeded 10.0% are high priority.

13.    Aspects affecting the abruptness of the transition at the bottom of curb ramps: Three aspects of curb ramps define the abruptness of their bottom transitions: running slope, counter (gutter) slope and the smoothness of the bottom transition. Each of these aspects can cause a curb ramp to be problematic when considered in isolation, as discussed above. When considered together, and with excessive slopes and edges working in conjunction, the negative effect can be much greater even than the simple sum of the barriers when considered individually. Even small deviations in the bottom of curb ramps that cause the transition to be more abrupt than standards allow have significant impact on persons with mobility disabilities. For example, a steep "V" shape formed by the ramp running slope and the opposing gutter slope can catch and trap the smaller wheels of a mobility device. When this happens, the device can flip and throw the occupant to the ground. The potential that the person using the mobility device will be harmed increases as that angle becomes more acute, and/or if there is a raised edge at the bottom transition. These conditions can also cause the user of a powered mobility device to become stranded. Powered mobility devices are commonly designed with front and rear guide wheels with large center drive wheels. As a person using such a device passes over the steep angle, the mobility device drive wheels lose contact with the ground. Because the device at this point is largely level, it does not roll forward or backward, and the person using the device can be stranded until assistance arrives. The following are a list of combined aspects that together create a severe barrier that is a high priority for remediation.

14.    Combination of localized running slope at the bottom of a curb ramp with an excessively steep gutter slope, when the sum of these slopes exceeds 15.0%: If the sum of the

localized running slope occurring at the bottom of the ramp plus the gutter slope exceeded 15.0%, the curb ramp is high priority.

15. <u>Combination of localized running slope at the bottom of a curb ramp with an excessively steep counter slope and non-flush transition</u>: This is similar to the previous combination with the addition of a bottom lip. If the sum of the localized running slope occurring at the bottom of the ramp plus the counter slope exceeded 13.4% and there was a non-flush transition, the curb ramp is high priority.

16. <u>Combination of counter slope exceeding 7.0% and non-flush transition</u>: If a curb ramp has a gutter slope exceeding 7.0% and a non-flush transition, the curb ramp is high priority.

Exhibit C

NOTICE OF PROPOSED SETTLEMENT OF CLASS ACTION LAWSUIT

ATTENTION: ALL PERSONS WITH A MOBILITY DISABILITY: If you have used, or attempted to use, pedestrian rights-of-way in the City of San Jose and have encountered corners on sidewalks or other pedestrian walkways that were missing curb ramps, or curb ramps that were damaged, in need of repair, or otherwise in a condition not suitable or sufficient for use ("Non-Compliant Curb Ramps"), you may be a member of the proposed Settlement Class affected by this lawsuit. This is a court-authorized notice.

A "Mobility Disability" means any impairment or medical condition which limits a person's ability to walk, ambulate, maneuver around objects, or ascend or descend steps or slopes. A person with a Mobility Disability may or may not use a wheelchair, scooter, electric personal assisted mobility device, crutches, walker, cane, brace, orthopedic device, or similar equipment or device to assist their navigation along a pedestrian walkway, or may be semi-ambulatory.

PLEASE READ THIS NOTICE CAREFULLY. YOUR RIGHTS MAY
BE AFFECTED BY LEGAL PROCEEDINGS IN THIS CASE.

NOTICE OF CLASS ACTION

The purpose of this notice is to inform you of a proposed settlement in a pending class action lawsuit brought on behalf of persons with Mobility Disabilities against the City of San Jose. The proposed class action settlement is set out in a document called a "proposed Consent Decree". The proposed Consent Decree, which must be approved by the United States District Court before it goes into effect, was reached in the case entitled *Lashbrook v. City of San Jose*, Case No. 5:20-cv-01236-NC, pending in the United States District Court for the Northern District of California.

BASIC INFORMATION

This lawsuit alleges that the City of San Jose ("City") violated federal and state disability access laws by allegedly failing to ensure that its pedestrian right of way contains curb ramps that are necessary to ensure that the pedestrian right of way is accessible to individuals with Mobility Disabilities. The City denies these allegations and disputes that it has any liability or committed any wrongdoing.

This is a class action. In a class action, one or more people or organizations, called Class Representatives (in this case Artie Lashbrook ["Plaintiff"]), sued on behalf of people who have similar legal claims. Plaintiff is a Class Member. One court resolves the issues for all Class Members. United States District Judge Nathaniel M. Cousins is in charge of this class action.

The Court did not decide in favor of either Plaintiff or the City in this case. Instead, both sides agreed to a settlement. That way, they avoid the cost, delay, and uncertainty of a trial, and settlement benefits go to the Class Members. The Class Representative and Class Counsel (the attorneys appointed by the Court to represent the Class) think the proposed settlement is in the best interests of the Class Members, taking into account the benefits of the settlement, the risks of continued litigation, and the delay in obtaining relief for the Class if the litigation continues.

1

## THE SETTLEMENT CLASS

The Settlement Class includes all persons (including residents of and/or visitors to the City of San Jose) with any Mobility Disability, who, at any time prior to court judgment granting final approval to the settlement have been denied full and equal access to the City's pedestrian right of way due to the lack of a curb ramp or a curb ramp that was damaged, in need of repair, or otherwise in a condition not suitable or sufficient for use.

## SUMMARY OF THE PROPOSED CONSENT DECREE

**The following is a summary of certain provisions of the proposed Consent Decree.  The Consent Decree is available as set forth in the "Further Information" section below.**

The proposed Consent Decree requires the City of San Jose to make widespread accessibility improvements by constructing and remediating 27,621 Non-Compliant Curb Ramps, by the end of 2038.

The proposed Consent Decree requires the City to construct or remediate an average of 1,944 high priority curb ramps per year between the date that the settlement goes into effect and 2030, and an average of 807 low priority curb ramps per year for the years 2031 to 2038.  To meet these construction deadlines, the City must appropriate $13,000,000 each fiscal year from the Effective Date of the settlement through 2030.  Thereafter, the City must appropriate a minimum of ten (10) percent of the City's pavement budget toward the construction and remediation of curb ramps until the City fulfills its obligations under the proposed Consent Decree.

The City will create a Transition Plan that will include a schedule for constructing and remediating curb ramps consistent with the results of a comprehensive survey of the accessibility of its pedestrian right of way to people with Mobility Disabilities that the City conducted as part of the settlement negotiations that resulted in the proposed Consent Decree.  The Transition Plan will also select priority locations for curb ramp construction and remediation as required by the ADA.

The proposed Consent Decree also commits the City to continue to maintain a system through which people with Mobility Disabilities may submit requests for construction of accessible curb ramps and remediation of inaccessible curb ramps.  The City will use its best efforts to remediate or construct each requested accessible curb ramp within 120 days of the request, except in very limited circumstances.

The proposed Consent Decree also includes provisions for the Class Representative and Class Counsel (identified below) to monitor the City's compliance with the terms of the settlement and requires the City to issue annual reports documenting the construction and remediation of curb ramps under the proposed Consent Decree.

## RELEASE OF CLAIMS

The proposed Consent Decree resolves and releases through the end of the Term of the proposed Consent Decree, all claims for injunctive, declaratory, or other non-monetary relief that were brought, could have been brought, or could be brought in the future relating to or arising from any of the City's alleged actions, omissions, incidents, or conduct related to the installation, remediation, repair, or maintenance of curb ramps in the City's pedestrian rights-of-way.  The

2

proposed Consent Decree does not provide for any monetary relief to the Settlement Class, and it does not release any monetary claims that Settlement Class members may have. The releases do not apply to components of the City's sidewalk system other than curb ramps.

## PAYMENTS TO CLASS REPRESENTATIVE

Class Counsel will request that Plaintiff and Class Representative Artie Lashbrook receive a $5,000 service award, paid by the City, in recognition of the services he rendered to the Settlement Class. Plaintiff Lashbrook will also receive a damages payment of $50,000 in exchange for a release of his individual monetary claims, including actual and statutory damages claims, related to the physical and emotional injuries he suffered as a result of his personal encounters with Non-Compliant Curb Ramps in the City's pedestrian right of way. Both payments must be approved by the Court.

## REASONABLE ATTORNEYS' FEES, COSTS AND EXPENSES

The settlement class is represented by Goldstein, Borgen, Dardarian & Ho and the Civil Rights Education and Enforcement Center (collectively referred to as "Class Counsel"). The City will pay Class Counsel their reasonable attorneys' fees, expenses, and costs of $734,627.50 subject to the approval by the Court. Class Counsel shall also be entitled to reasonable attorneys' fees and costs for monitoring the City's compliance with the settlement as set forth in the proposed Consent Decree. Plaintiff's fees, expenses, and costs for monitoring will be capped at $75,000 for the years 2020 through 2022, and capped at $50,000 per year for the years 2023 through the expiration of the Term of the proposed Consent Decree. Notwithstanding the fee provisions of the proposed Consent Decree, all fees awarded to Class Counsel are subject to approval by the Court.

## FAIRNESS OF SETTLEMENT

The Class Representative and Class Counsel have concluded that the terms and conditions of the proposed Consent Decree are fair, reasonable, adequate, and in the best interests of the Settlement Class. In reaching this conclusion, the Class Representative and Class Counsel have considered the benefits of the settlement, the possible outcomes of litigation of these issues, the expense and length of litigation, and actual and possible appeals.

## THE COURT'S FINAL APPROVAL/FAIRNESS HEARING

The Court has preliminarily approved the proposed Consent Decree, and has scheduled a "Final Approval" or "Fairness" hearing for [insert date, time, and location] to decide whether the proposed settlement is fair, reasonable, and adequate, and should be finally approved. Although you are not required to attend, as a Settlement Class Member, you have the right to attend and be heard at this hearing, as specified in the next section below. At the hearing, the Court will consider any objections to the settlement. Judge Cousins will listen to people who have asked to speak at the hearing. After the hearing, the Court will decide whether to approve the settlement. The Court will also evaluate the agreed upon amount to award Class Counsel as reasonable attorneys' fees, costs and litigation expenses. We do not know how long this decision will take.

This hearing date is subject to change without further notice. If you wish to be informed of any

changes to the schedule, please notify Class Counsel at the addresses listed in the next section below.  You may also check www._____or the public court records on file in this action at https://www.pacer.gov/ for any updates.

<u>OBJECTIONS TO THE SETTLEMENT</u>

If you do not want the proposed Consent Decree to be approved, you can ask the Court to deny approval by filing an objection.  You cannot ask the Court to order a different settlement or change the settlement; the Court can only approve or reject the settlement.  If the Court denies approval, the Settlement Class will not get the curb ramp installation and remediation work set out in the proposed Consent Decree, and the lawsuit will continue.  If that is what you want to happen, you must object.

Any objection to the proposed Consent Decree must be in writing.  If you file a timely written objection, you may, but are not required to, appear at the Final Approval Hearing, either in person or through your own attorney.  If you appear through your own attorney, you are responsible for hiring and paying that attorney.

All written objections and supporting papers must (a) clearly identify the case name and number (*Lashbrook v. City of San Jose*, Case No. 5:20-cv-01236-NC), (b) be submitted to the Court either by mailing them to the Class Action Clerk, United States District Court for the Northern District of California, 280 South 1st Street, San Jose, California, 95113 or by filing them in person at any location of the United States District Court for the Northern District of California, and (c) be filed or postmarked on or before _____.

If you submit an objection, it should include the following information: (a) your name, address, and, if available, your telephone number and e-mail address; (b) if you are being represented by counsel, the name, address, telephone number and e-mail address of your attorney; (c) a statement identifying the specific grounds for your objections; and (d) a statement of whether your objection applies only to you, to a specific subset of the class, or to the entire class.

**All objections must be submitted or postmarked on or before [date].**

All objections should also be sent to Class Counsel at the following address:

> Linda M. Dardarian
> Goldstein, Borgen, Dardarian & Ho
> 300 Lakeside Drive, Suite 1000
> Oakland, CA 94612

You may, but are not required to, appear at the Final Approval Hearing scheduled for [insert date, time, and location] to have your objection heard by the Court.

**Any Class Member who does not object at or before the Final Approval Hearing will be deemed to have approved the settlement and to have waived such objections and shall not be able to make any objections (by appeal or otherwise) to the settlement.**

**IF YOU DO NOT OPPOSE THIS SETTLEMENT, YOU NEED NOT APPEAR OR FILE ANYTHING IN WRITING.**

4

BINDING EFFECT

The proposed Consent Decree, if given final approval by the Court, will bind all members of the Settlement Class.  This will bar any person who is a member of the Settlement Class from prosecuting or maintaining any claim or action released under the terms of the proposed Consent Decree.

FURTHER INFORMATION

This notice summarizes the proposed Consent Decree.  For the precise and full terms and conditions of the settlement, please see the proposed Consent Decree available at www._____, by contacting Class Counsel at the addresses and phone numbers below, or by accessing the Court docket on this case through the Court's Public Access to Electronic Records (PACER) system at https://ecf.cand.uscourts.gov, or by visiting the office of the Clerk of the Court for the United States District Court for the Northern District of California, 280 South 1st Street, San Jose, California, between 9:00 a.m. and 4:00 p.m., Monday through Friday, excluding Court holidays.

You can also obtain more detailed information about the settlement or a copy of the proposed Consent Decree from Class Counsel at any of the following addresses:

Linda M. Dardarian
Goldstein, Borgen, Dardarian & Ho
300 Lakeside Drive, Suite 1000
Oakland, CA  94612
(510) 763-9800
www.gbdhlegal.com

Timothy P. Fox
Civil Rights Education and Enforcement Center
1245 E. Colfax Avenue, Suite 400
Denver, CO  80218
(303) 757-7901
www.creeclaw.org

Class Members may also contact Class Counsel at the following toll-free number, 1-800-538-1467, to obtain further information about the settlement or settlement documents.

**Please do not telephone the Court or the Court Clerk's Office to inquire about this settlement.**

To obtain copies of this Notice or the proposed Consent Decree in alternative accessible formats, please contact Class Counsel listed above.

7778128

Exhibit D

1   Linda M. Dardarian (SBN 131001)
    ldardarian@gbdhlegal.com
2   Andrew P. Lee (SBN 245903)
    alee@gbdhlegal.com
3   GOLDSTEIN, BORGEN, DARDARIAN & HO
    300 Lakeside Drive, Suite 1000
4   Oakland, CA 94612
    Tel:  (510) 763-9800
5   Fax:  (510) 835-1417

6   Timothy P. Fox (SBN 157750)
    tfox@creeclaw.org
7   CIVIL RIGHTS EDUCATION AND ENFORCEMENT
    CENTER
8   1245 Colfax Avenue, Suite 400
    Denver, CO 80218
9   Tel:  (303) 757-7901

10  *Attorneys for Plaintiff*

11              **UNITED STATES DISTRICT COURT**

12            **NORTHERN DISTRICT OF CALIFORNIA**

13                  **SAN JOSE DIVISION**

14  ARTIE LASHBROOK,                    Case No.: 5:20-CV-01236-NC

15         Plaintiff,                   **CLASS ACTION**

16  vs.                                 **[PROPOSED] ORDER (1) GRANTING
                                        PRELIMINARY APPROVAL OF**
17  CITY OF SAN JOSE,                   **SETTLEMENT; (2) GRANTING
                                        CERTIFICATION OF SETTLEMENT**
18         Defendant.                   **CLASS; (3) DIRECTING NOTICE TO THE
                                        CLASS; AND (4) SETTING DATE FOR**
19                                      **FAIRNESS HEARING**

20

21

22

23

24

25

26

27

28

# ORDER

The Parties have applied to the Court for an order preliminarily approving the settlement of this action in accord with the Proposed Consent Decree ("Decree"), which sets forth the terms and conditions of a proposed settlement and dismissal of the action with prejudice, with the Court retaining jurisdiction to enforce the Decree throughout its term.  Having read the papers submitted and carefully considered the arguments and relevant legal authority, and good cause appearing, the Court GRANTS the Parties' Joint Motion for Preliminary Approval of Class Action Settlement.

NOW, THEREFORE, IT IS HEREBY ORDERED:

1.      This Court grants the Parties' Joint Motion for Class Certification, certifying a class for declaratory and injunctive relief.  The Court finds, for purposes of settlement only, and conditioned upon the entry of this Order and the Final Judgment and Order Approving Settlement, that the requirements of Rule 23 of the Federal Rules of Civil Procedure are met by the Settlement Class: (a) joinder of all Settlement Class Members in a single proceeding would be impracticable, if not impossible, because of their numbers and dispersion; (b) there are questions of law and fact common to the Settlement Class; (c) Plaintiff's claims are typical of the claims of the Settlement Class that he seeks to represent for purposes of settlement; (d) Plaintiff has fairly and adequately represented the interests of the Settlement Class and will continue to do so; (e) Plaintiff and the Settlement Class are represented by qualified, reputable counsel who are experienced in preparing and prosecuting class actions, including those involving the allegations made in the Complaint; and (f) the City acted or refused to act on grounds that apply generally to the Settlement Class, so that final declaratory and injunctive relief is appropriate to the Settlement Class.  Accordingly, the Court hereby certifies the following Settlement Class pursuant to Federal Rule of Civil Procedure 23(a) and (b)(2):  all persons (including residents of and/or visitors to the City of San Jose) with any Mobility Disability, who, at any time prior to the Court granting final approval of the Consent Decree, have been denied full and equal access to the City's pedestrian right of way due to the lack of a curb ramp or a curb ramp that was damaged, in need of repair, or otherwise in a condition not suitable or sufficient for use.  Pursuant to Federal Rule Civil Procedure 23(c)(1)(B), the Court appoints named Plaintiff and his counsel as representatives of the Settlement Class.

1

2.      The Court hereby preliminarily approves the Decree.  The Court finds on a preliminary basis that the Decree is fair, adequate and reasonable to all potential Class Members.  It further appears that extensive evaluation of the merits has been conducted such that Counsel for the Parties are able to reasonably evaluate their respective positions.  It also appears to the Court that settlement at this time will avoid substantial additional costs to all Parties, as well as avoid the delay and the risks presented by further prosecution of issues either in the current or separate litigation proceedings which are addressed by the Decree.  It further appears that the Decree has been reached as the result of good faith, prolonged, serious, and non-collusive arms-length negotiations.

3.      The Court hereby approves, as to form and content, the proposed Notice, attached as Exhibit C to the Decree.  The Court finds that the distribution of the Notice in the manner and form set forth in the Decree meets the requirements of due process and Federal Rules of Civil Procedure 23(c)(2) and 23(e).  This Notice is the best practicable under the circumstances, and shall constitute due and sufficient notice to all persons entitled thereto.  The Parties shall submit declarations to the Court as part of their Motion for Final Approval of the Class Action Settlement confirming compliance with the notice provisions of the Decree.

4.      A hearing on final approval of the Decree ("Fairness Hearing") shall be held before the Court on a date to be set by the Court to determine all necessary matters concerning the Decree, including whether the proposed Decree's terms and conditions are fair, adequate, and reasonable, and whether the Decree should receive final approval by the Court, as well as to rule on Class Counsel's motion requesting an award of reasonable attorneys' fees, costs and expenses.

5.      Any Settlement Class Member may object to this Consent Decree by filing, no later than forty-five (45) calendar days after the initial publication of the Settlement Notice (the "Objection Deadline"), written objections with the Court.  Any Settlement Class Member may object to any aspect of the proposed Consent Decree either on his or her own or through an attorney hired at his or her expense.  Any Settlement Class Member who wishes to object to the proposed Consent Decree may file a written statement of objection no later than the Objection Deadline.  Such statement should include: (a) the name, address, and, if available, telephone number and e-mail address of the Class Member objecting,  (b) if represented by counsel, the name, address, telephone number and e-mail

address of his or her counsel; (c) a statement identifying the specific grounds for the Class Member's objection; and (d) a statement of whether his or her objection applies to the Class Member, to a specific subset of the class, or to the entire class.

6.      Any Class Member who wishes to object to the proposed Decree may also present objections at the Fairness Hearing.

7.      The procedures and requirements for filing objections in connection with the Fairness Hearing are intended to ensure the efficient administration of justice and the orderly presentation of any Settlement Class Members' objection to the Decree, in accordance with the due process rights of all Settlement Class Members.

8.      Class Counsel shall provide copies of any objections to Defendant's counsel within two (2) court days of receipt.  Class Counsel shall also file any objections with the Court no less than ten (10) calendar days before the Fairness Hearing.

9.      Pending the Fairness Hearing, all proceedings in this Action, other than proceedings necessary to carry out and enforce the terms and conditions of the Decree and this Order, are hereby stayed.  Additionally, the Court enjoins all Settlement Class Members from asserting or maintaining any claims to be released by the Decree until the date of the Fairness Hearing.

10.     In accordance with the above, the Court adopts the following schedule:

a.      Within ten (10) calendar days after entry of the Order Granting Preliminary Approval, Class Counsel shall mail, via U.S. mail and/or email, the Notice in the form of Exhibit C to the Decree to all organizations identified in Exhibit E to the Decree.

b.      Within twenty (20) calendar days after entry of the Order Granting Preliminary Approval, Notice in the form of Exhibit C to the Decree shall be posted by Class Counsel on a case-specific website established by Class Counsel.  The websites will have copies of the Notice in English, Spanish, and Vietnamese.  In addition, the websites will provide information about how Settlement Class Members may obtain a copy of the Consent Decree.  The City shall post the Notice on the City of San Jose's official website, where it shall remain posted for four (4) consecutive weeks.  The website will also make a copy of the Notice available in English, Spanish, and Vietnamese.

c.      Commencing within thirty (30) calendar days after entry of the Order Granting

3

Preliminary Approval, the City shall cause to be published Notice in the form of Exhibit C to the proposed Consent Decree in The San Jose Mercury News once each week for four (4) consecutive weeks.  Within ten (10) days after the District Court has issued the Preliminary Approval Order, Class Counsel will cause a copy of the Notice to be provided (via email or U.S. Mail) to organizations listed on Exhibit E of the proposed Consent Decree.

          d.      Each Class Member shall be given a full opportunity to object to the proposed Settlement and Class Counsel's request for an award of reasonable attorneys' fees, expenses, and costs, and to participate at the Fairness Hearing.  Any Class Member seeking to object to the proposed Settlement may submit an objection to the District Court in writing, via regular mail or filed in person.

          e.      Thirty-five (35) calendar days prior to the Objection Deadline, Plaintiff shall file a Motion for an Award of Reasonable Attorneys' Fees, Expenses, and Costs.  The hearing on that Motion shall be concurrent with the Fairness Hearing.

          f.      The Parties shall file a Joint Motion for Final Approval and may respond to objections, if any, no later than five (5) calendar days prior to the Fairness Hearing.  On the same date, the Parties shall also file statements of compliance with notice requirements.

          g.      The Fairness hearing shall be held on _____, 2020 at _____ o'clock in Courtroom _____ of the above-referenced Court.

11.     In the event the Court does not grant final approval of the Settlement, or for any reason the Parties fail to obtain a Final Judgment and Order Approving Settlement as contemplated by the Decree, or the Decree is terminated pursuant to its terms for any reason, or the Effective Date does not occur for any reason, then the Decree and all orders and findings entered in connection with the Decree and the Settlement shall become null and void and be of no further force and effect whatsoever, shall not be used or referred to for any purpose whatsoever, and shall not be admissible or discoverable in this or any other proceeding.

This Order shall not be construed or used as an admission, concession, or declaration by or against the City of any fault, wrongdoing, breach, or liability.  It shall not be deemed to be a stipulation as to the propriety of class certification, or any admission of fact or law regarding any request for class certification, in any other action or proceeding, whether or not involving the same or similar claims.

4

1        Nor shall this Order be construed or used as an admission, concession, or declaration by or

2    against Plaintiff or the other Settlement Class Members that their claims lack merit or that the relief

3    requested is inappropriate, improper, or unavailable, or as a waiver by any Party of any defenses or

4    claims he, she, or it may have in the Action or in any other proceeding.

6        **IT IS SO ORDERED.**

8    Dated: _____          _____

9                                          United States District Judge

777855.9

Exhibit E

**Organizations to Receive Settlement Notice**

1. Bay Area Association of Disabled Sailors
2. Bay Area Outreach and Recreation Program (BORP)
3. Californians for Disability Rights
4. California Foundation for Independent Living Centers (Sacramento)
5. Center for Independent Living – Berkeley
6. Center for Independence of Individuals with Disabilities (CID, San Mateo)
7. Central Coast Center for Independent Living (CCCIL, Monterey, San Benito, and Santa Cruz Counties)
8. Community Resources for Independent Living (CRIL, Hayward)
9. Disability Action Center (DAC) (Chico)
10. Disability Services and Legal Center (DSLC) (Santa Rosa)
11. FREED Center for Independent Living (FREED) (Grass Valley)
12. Independent Living Resource Center San Francisco (ILRCSF)
13. Independent Living Resources of Solano & Contra Costa Counties (ILR)
14. Marin Center for Independent Living (MCIL)
15. Placer Independent Resource Services (PIRS) (Auburn)
16. Resources for Independence Central Valley (RICV) (Fresno)
17. Resources for Independent Living (RIL, Sacramento)
18. Silicon Valley Independent Living Center (SVILC)
19. Tri-Country Independent Living (TCIL) (Eureka)
20. Paralyzed Veterans of America, Sacramento National Service Office
21. Paralyzed Veterans of America, Bay Area & Western Chapter
22. United Spinal San Francisco Bay Area Chapter
23. NorCal SCI – Northern California Chapter of United Spinal
24. Disability Rights California
25. Bay Area Legal Aid
26. North Bay Regional Center
27. Regional Center for the East Bay
28. Golden Gate Regional Center
29. Alta Regional Center (Sacramento)
30. Central Valley Regional Center (Fresno, Merced, Visalia)
31. American Association of People with Disabilities
32. Easter Seals
33. United Cerebral Palsy of the Golden Gate
34. Any cases pending in the United States District Court, Northern District, based in whole or part upon claims similar to those released by the Agreement where the City is named as a party and has entered an appearance

Exhibit F

1  Linda M. Dardarian (SBN 131001)
   ldardarian@gbdhlegal.com
2  Andrew P. Lee (SBN 245903)
   alee@gbdhlegal.com
3  GOLDSTEIN, BORGEN, DARDARIAN & HO
   300 Lakeside Drive, Suite 1000
4  Oakland, CA 94612
   Tel:  (510) 763-9800
5  Fax:  (510) 835-1417

6  Timothy P. Fox (SBN 157750)
   tfox@creeclaw.org
7  CIVIL RIGHTS EDUCATION AND ENFORCEMENT
   CENTER
8  1245 E. Colfax Avenue, Suite 400
   Denver, CO 80218
9  Tel:  (303) 757-7901

10 *Attorneys for Plaintiff*

11            **UNITED STATES DISTRICT COURT**

12          **NORTHERN DISTRICT OF CALIFORNIA**

13                 **SAN JOSE DIVISION**

14 ARTIE LASHBROOK,                    | **CLASS ACTION**

15        Plaintiff,                   | Case No.: 5:20-CV-01236-NC

16 vs.                                 | **[PROPOSED] FINAL JUDGMENT AND
                                         ORDER APPROVING CLASS ACTION
17 CITY OF SAN JOSE,                     SETTLEMENT**

18        Defendant.                   | Date:    TBD
                                         Time:    TBD
19                                       Dept:    TBD

20

21

22

23

24

25

26

27

28

WHEREAS, on _____, 2020, the Court held a hearing (the "Fairness Hearing") to determine, among other things, whether the settlement in this action by Defendant City of San Jose ("the City") and Plaintiff Artie Lashbrook ("Plaintiff"), as set forth in the Consent Decree, a copy of which is attached hereto as Exhibit 1 (the "Consent Decree"), is fair, reasonable and adequate, such that an Order of final approval should be issued and a final judgment upon said Consent Decree should be entered by the Court,

WHEREAS, the Fairness Hearing was attended by the Parties, through their respective counsel of record in this action, and by such other individuals and entities as set forth in the record in this matter, and

WHEREAS, the Court has issued its Order giving final approval to the Parties' settlement set forth in the Consent Decree after the Fairness Hearing,

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED AS FOLLOWS:

1. The Court, for the purposes of this Judgment, adopts the terms and definitions set forth in the Consent Decree.

2. The Court has jurisdiction over the subject matter of this action, the Plaintiff, the Settlement Class, the Consent Decree, and the City.

3. The Court finds that the notice to the Settlement Class of the pendency of this action and of the proposed settlement was disseminated by each of the means required under the Consent Decree and the Order of this Court dated _____, 2020, and was otherwise fully implemented.

4. The Court finds that such notice to the Settlement Class, as ordered and implemented, was reasonably calculated under the circumstances to apprise the Settlement Class Members of the pendency of this action, all material elements of the proposed settlement, and their opportunity (a) to submit written objections to the Settlement, and (b) to appear at the Fairness Hearing to object to or comment on the Settlement. The Notice of Settlement was reasonable and the best notice practicable to all Settlement Class Members and complied with the Federal Rules of Civil Procedure, due process, and all other applicable laws and rules. A full and fair opportunity has been afforded to the members of the Settlement Class to participate during the Fairness Hearing, and all other persons wishing to be

1  heard have been heard.  Accordingly, the Court determines that all members of the Settlement Class, as

2  set forth below, are bound by this Judgment.

3       5.     On _____ 2020, this Court appointed Plaintiff as class representative of

4  the Settlement Class, and appointed the following counsel as Class Counsel to represent the Settlement

5  Class: (i) Goldstein Borgen Dardarian & Ho; and (ii) Civil Rights Education and Enforcement Center.

6       6.     On _____, 2020, this Court provisionally certified the Settlement Class

7  based on the findings in the Order of the same date.  This Court finds that the Settlement Class

8  continues to meet the requirements for class certification under the Federal Rules of Civil Procedure

9  and all other applicable laws and rules.

10       7.     In particular, the Court finds that: (a) joinder of all Settlement Class Members in a

11  single proceeding would be impracticable, if not impossible, because of their numbers and dispersion;

12  (b) there are questions of law and fact common to the Settlement Class; (c) Plaintiff's claims are

13  typical of the claims of the Settlement Class that he seeks to represent for purposes of settlement; (d)

14  Plaintiff has fairly and adequately represented the interests of the Settlement Class and will continue to

15  do so; (e) Plaintiff and the Settlement Class are represented by qualified, reputable counsel who are

16  experienced in preparing and prosecuting class actions, including those involving the sort of practices

17  alleged in the Complaint; and (f) the City acted or refused to act on grounds that apply to the

18  Settlement Class, so that final declaratory and injunctive relief is appropriate to the Settlement Class.

19       8.     Class certification is therefore an appropriate method for protecting the interests of the

20  Settlement Class and resolving the common issues of fact and law arising out of the Plaintiff's claims

21  while also eliminating the risk of duplicative litigation.  Accordingly, the Court hereby makes final its

22  earlier provisional certification of the Settlement Class and further confirms the appointment of the

23  Class Representative and Class Counsel to represent the Settlement Class, as set forth above.

24       9.     The Court grants final approval of the Settlement set forth in the Consent Decree and

25  finds that it is fair, reasonable, adequate, and in the best interests of the Settlement Class as a whole.

26  The Court grants final approval of the release of the City from the Released Claims as set forth in the

27  Consent Decree.

28       10.     The Court further finds that the City's Annual Commitment, which requires the

2

installation or remediation of 27,621 Non-Compliant Curb Ramps by the end of 2038, as set forth in the Consent Decree is proper and reasonably calculated based on the available information to maintain and ensure accessibility of the pedestrian right of way located in the City of San Jose to persons with Mobility Disabilities.  Accordingly, the Settlement shall be consummated in accordance with the terms and conditions of the Consent Decree.

11.    Objections to the Settlement are overruled for the reasons explained in the Court's accompanying findings.

12.    The Class Representative and all Settlement Class Members (and their respective heirs, assigns, successors, executors, administrators, agents and representatives) are conclusively deemed to have released and forever discharged the City from all Released Claims as set forth in the Consent Decree.  All Settlement Class Members are bound by this Judgment.

13.    The benefits described in the Consent Decree are the only consideration, fees, costs and expenses that the City shall be obligated to give to any party or entity, including without limitation the Class Representative, Settlement Class Members, and Class Counsel in connection with the claims released in the Consent Decree and/or the payment of attorneys' fees, costs and expenses in this action.

14.    The Consent Decree and this Judgment are not admissions of liability or fault by the City, or a finding of the validity of any claims in this action or of any wrongdoing or violation of law by the City.  The Consent Decree is not a concession by the Parties and, to the fullest extent permitted by law, neither this Judgment, nor any of its terms or provisions, nor any of the negotiations connected with it, shall be offered as evidence or received in evidence in any pending or future civil, criminal, or administrative action or proceeding to establish any liability of, or admission by the City.

15.    Notwithstanding the foregoing, nothing in this Judgment shall be interpreted to prohibit the use of this Judgment to consummate or enforce the Consent Decree or Judgment, or to defend against the assertion of Released Claims in any other proceeding, or as otherwise required by law.

16.    In accordance with the terms of the Consent Decree, which is attached hereto, the Court reserves exclusive and continuing jurisdiction over Plaintiff, the Settlement Class Members, the City, and the Consent Decree throughout the term of the Consent Decree, for the sole purpose of supervising the implementation, enforcement, construction, and interpretation of the Consent Decree and this

Judgment.  In that regard, any challenges to the Consent Decree's terms or implementation, whether under state or federal law, shall be subject to the exclusive and continuing jurisdiction of this Court.

**IT IS SO ORDERED.**


Dated: _____          _____

United States District Judge

777902.5